Stephenson, J.
 

 When motions for directed verdicts were interposed by both sides, each admitted that the testimony of the other was true and that it would be considered in its most favorable light toward the party moved against. In considering the “favorable light” phase under such circumstances, we arrive at the only rational conclusion, that the “favorable light” goes out and the testimony of each of the parties litigant is considered for what it is worth.
 

 The trial judge found that Carden had a steel shovel in his hand when he was struck by the bolt of lightning. He took judicial notice of the fact that the steel shovel was a conductor of electrical current; that Carden’s work made it necessary for him to be equipped with a shovel and that thereby his employment exposed him to a hazard greater than that experienced by the general public. It is conceded that Carden was killed by a “force of nature”.
 

 Take the syllabus in the case of
 
 Slanina
 
 v.
 
 Industrial Commission,
 
 117 Ohio St., 329, 158 N. E., 829:
 

 “In case an employe, in the discharge of the duties of his employment, is injured as a result of the unexpected violence of the forces of nature, to wit, ‘a destructive tornado,’ where his duties do not expose him to a special or peculiar danger from the elements which caused the injury, greater than other persons in the community, such employe is not entitled to com
 
 *347
 
 pensation under the Workmen’s Compensation Act.”
 

 Applying antithetic reasoning to this syllabus, we extract this proposition of law, that if an employee’s duties expose him to a special or peculiar danger from the elements which caused the injury, greater than other persons in the community, such employee
 
 is entitled
 
 to compensation under the Workmen’s Compensation Act.
 

 The field of compensability has been appreciably enlarged within the past eighteen years.
 

 The fifth paragraph of the syllabus in the case of
 
 Fassig
 
 v.
 
 State, ex rel. Turner, Atty. Genl.,
 
 95 Ohio St., 232, 116 N. E., 104 (1917), reads as follows:
 

 “The provisions in Section 35, Article II of the Constitution, and in the statute with reference to an injury received in the course of employment refer only to an injury which is the result of or arises out of the employment. Such provisions do not cover any injury which has its cause outside of and disconnected with the employment, although the employe may at the time have been engaged in the work of his employer in the usual way.”
 

 Under the law as stated therein there could be no recovery in the instant case, as the lightning which caused the death was outside of and disconnected with the employment of Carden, notwithstanding he might have been engaged in the work of his employer when killed.
 

 The
 
 Fassig case, supra,
 
 was approved and followed in the case of
 
 Industrial Commission
 
 v.
 
 Weigandt,
 
 102 Ohio St., 1, 130 N. E., 38, where it is stated in the fourth paragraph of the syllabus that:
 

 “The statute was intended to provide a speedy and inexpensive remedy as a substitute for previous unsatisfactory methods, and should be liberally construed in favor of employes.”
 

 Both the
 
 Weigandt
 
 and
 
 Fassig cases
 
 were approved and followed in the
 
 Slanina case, supra.
 
 Recovery was
 
 *348
 
 denied in the
 
 Slanina case
 
 in the following words, at page 336:
 

 “Entertaining the view that'this record presents a case where the employe, even though injured while in the course of his employment, received such injury as a result of the forces of nature, and from a risk and danger to which the general public was exposed, and not peculiar to the employment, it therefore follows that there can be no recovery under the terms of the Workmen’s Compensation Act.”
 

 At page 333 of the same case, the court says:
 

 “The fact that the injury was caused.by the act of God does not, however, necessarily deprive the injured party of the right to recover under the Workmen’s Compensation Act, if the employe’s duties exposed him to some special danger not common to the public.”
 

 These two excerpts from the opinion do not constitute the law of the case, but the syllabus must be construed in the light of the reasoning gleaned from the opinion. We assume that the trial judge was conversant with the
 
 Slanina, Weigandt
 
 and
 
 Fassig cases,
 
 and that his version of the law, while couched in different language, is a fair statement of the law.
 

 These cases are approved and followed in
 
 Grabler Mfg. Co.
 
 v.
 
 Wrobel,
 
 125 Ohio St., 265, 181 N. E., 97, and
 
 Industrial Commission
 
 v.
 
 Nelson,
 
 127 Ohio St., 41, 186 N. E., 735.
 

 Let us consider the first and second paragraphs of the syllabus in the case of
 
 Industrial Commission
 
 v.
 
 Nelson, supra,
 
 which read as follows:
 

 “1. An injury is not compensable, under the workmen’s compensation law of this state, unless the employment has some causal connection with the injury, either through its activities, its conditions or its environments.
 

 “2. But whenever the conditions attached to the place of employment are factors in causing injury to
 
 *349
 
 a workman engaged therein sneh injury arises out of the employment and is compensable.” '
 

 If it were established beyond cavil that Carden had a steel shovel in his hand at the time he was struck by the bolt of lightning, this case would be on all fours with the case of
 
 United States Fidelity & Guaranty Co.
 
 v.
 
 Rochester
 
 (Tex. Civ. App.), 281 S. W., 306, affirmed by the Supreme Court of Texas, 115 Tex., 404, 283 S. W., 135.
 

 Section 5246-82, Texas Revised Civil Statutes, then provided:
 

 “The term ‘injury sustained in the course of employment,’ as used in this Act shall not include:
 

 “1. An injury caused by the act of God, unless the employe is at the time engaged in the performance of duties that subject him to a greater hazard from the act of God responsible for the injury than ordinarily applies to the general public.”
 

 A short statement of fact will suffice to show how nearly akin these cases really are. Rochester, on July 30, 1924, was engaged in excavating a 6-inch and a 2-inch pipe line, which pipe lines were buried eighteen inches underground. He was using a steel shovel in removing the earth from the pipe lines, and while so engaged he was struck by a bolt of lightning that caused immediate death. Three fellow employees testified that he had the shovel in his hands when struck and that the wooden handle of the shovel was split by the bolt of lightning that killed him. Application for compensation was made by Rochester’s dependents and an award was made in their favor. The employer carried the case to court. This award was upheld in all the courts.
 

 An expert was called to prove that lightning traveled along the line of least resistance and that steel was a conductor. The purpose of this testimony was to prove that Rochester, with the steel shovel in his hand, was more likely to be struck by lightning than
 
 *350
 
 one who was not so equipped. The shovel was the implement of Rochester’s trade. He had the shovel in his hands because the nature of the work required him to have it. It was a condition of employment and furnished the causal connection between the employment and his death. The general public in the vicinity were not equipped with shovels, consequently Rochester’s duties subjected him to a greater hazard from the act of God that caused his death than that of the general public.
 

 Strenuous objection was made to the testimony of the expert, on the ground that he failed to qualify. The court did not take this objection seriously, holding, as it did in the fourth paragraph of the syllabus, that courts may take judicial notice of what is said in books relating to the subject of electricity.
 

 This court, in passing on the case of
 
 Thrailkill, a Taxpayer,
 
 v.
 
 Smith, Secy. of State,
 
 106 Ohio St., 1, at page 4, 138 N. E., 532, said':
 

 "It is a rule of law, which has been declared by the federal courts, in which rule we concur, that courts may take judicial notice of any scientific fact which may be ascertained by reference to a standard dictionary.”
 

 Upon an• examination of the latest Webster’s New International Dictionary, Second Edition, unabridged, under the word "conductor”, sub-head "Physics and Electricity”, we find that iron is a conductor of electrical current, and we further find from the same book that steel is a commercial form of iron. Hence the trial court in the case before us was not predicating an "inference upon an inference,” as contended by the Industrial Commission, when he found that the steel shovel involved in this case was a conductor of electrical current.
 

 As hereinbefore stated, the trial court was sitting as a jury. Of course we will not weigh the evidence, but we are obliged to search the record to determine
 
 *351
 
 whether there is any evidence to support the court’s finding. In order to properly determine this question, we will analyze all the testimony bearing upon it.
 

 It is conceded that no one saw Carden when he was struck by lightning; consequently, there is no direct testimony as to whether he had the shovel in his hands when he was killed. Was there any testimony from which a reasonable and logical inference could be drawn that he did, as a matter of fact, have the shovel in his hands when struck by the bolt of lightning?
 

 It will be borne in mind that a fisherman 1000 feet distant from the point where Carden’s body was found, was killed by the same bolt of lightning; and another man, Neylon Griffin, 200 feet away, received a shock sufficient to stop his watch and knock an alemite can out of his hand. Frank Bell also testified in this connection, as follows: “I don’t believe I was over 300 feet away from him when he was struck and I could feel my hair burning on my head.”
 

 The record is silent as to what the fisherman had in his hands when killed. In the absence of any testimony along that line, it is fair to assume that he was not fishing with a steel shovel. It is reasonable to conclude that Carden was killed about 11:05 a. m., as Griffin testified that his watch stopped at that time and had never run since.
 

 It must be conceded that it had been raining during that morning. The ground was wet and it was muddy. Frank Bell was Carden’s boss. He testified that about 9 o’clock it had rained and Carden had worked in the rain. It stopped raining and Carden asked leave to go to the shanty and change his shoes, which were wet, for rubber boots. This leave was granted and the change was made. Shortly before 11 o’clock Bell told Carden to get the roadway leveled off, as he was expecting the oil truck in, and Carden went down to the roadway.
 

 
 *352
 
 Rose Goodman, wife of the supervisor of the dump in question, testified:
 

 “* * *
 
 I know him [Carden] very good. * * * He had a shovel there and he pick up the driveway for the city. * * * I go away from him about 25 foot and a big lightning come and after the lightning was a big thunder and I tried to beat it to the office where my husband was; I tried to go quick to him. I get to the office and stay a couple minutes and there was a big rain and then the rain was stopped and I come out again and I see people run from my place about 50 foot. I come back and see the people running and I go and see the fellow there, he lay like sleeping ***.** * He wasn’t right at the place where I talked to him, he was another place”.
 

 The following questions were asked her and she gave the following answers:
 

 “Q. What clothing was Mr. Carson [Carden] wearing when you talked to him, boots? A. No, he has got shoes, no boots. I think maybe he got overalls on.
 

 “Q. Are you positive about that or not? A. No; I don’t remember.
 

 “Q. You didn’t observe, then; is that your answer? A. Oh, I am in a hurry — I don’t know.”
 

 Neylon Griffin testified in effect that he saw Carden when he left the shanty or garage. He had his boots on and a big gum coat and hat. Then the witness gave the details of the storm, how the lightning affected him; that when he next saw Carden he was dead. His body was about 200 feet from the garage.
 

 This witness was asked:
 

 “Q. Where was the body of George Carden from your garage when you saw it? A. I imagine about 200 foot.
 

 “Q. Was it on or near the roadway? A. Well, you see, there’s a sewer; it is a deep sewer runs pret’near in our garage along the roadway, and it is covered along about 150 from the garage and then it is open
 

 
 *353
 
 like a bowl. And then there’s a ledge, it is probably 15 feet wide before it gets to the roadway, and it was on this ledge that the body was laying.
 

 “Q. Did you notice whether he had a rake? A. No; he didn’t have it with him then. I think it was laying some little distance away.”
 

 “Q. But you are the one that found him? A. He [the boss] drove right by him and didn’t see him and the police went around him and didn’t see him.”
 

 “Q. Did you notice whether he had a shovel when he went out? A. It seems to me he had a rake.
 

 “Q. "What kind of rake? A. Just a rake, garden rake.
 

 “Q. Part of it metal? A. Well, the rake part.
 

 “Q. Steel rake with wooden handle; is that correct? A. Yes; if he had it at.that time. I think he had it when he walked out of the garage.”
 

 “Q. Where had he been working that morning
 
 *
 
 * * ? A. On the grade * * * they were resurfacing it, broken asphalt — putting it over it, preparing it for oil and they thought the oil man was coming down that afternoon to oil it and that is why they were preparing for it.”
 

 Prank Bell, Carden’s boss, further testified:
 

 “Was George Carden there that morning? A. Yes, he was. * * * we were leveling to get the road ready for oil. * * * I told him to get the roadway leveled off up at the top because I expected the oil tank pretty soon; he went down there and worked there and I presume he weiit off the road on the top of the bank looking at the sewer, how the water was raising, and just at that time I suppose he was struck by lightning and he laid there.
 

 “Q. How far was he from the roadway? A. Well in the neighborhood of maybe 20 feet, or so.
 

 “Q. How wide is the roadway? A. I couldn’t say, exactly, how wide it was. * * * I figure the roadway is around 40 feet, 35, something.
 

 
 *354
 
 “You say it was 11:00, or a few minutes past?”
 

 Witness asks question, viz, “When he was hit?”
 

 “Q. When he changed his shoes. A. That was before 11:00, when he went to change his shoes.
 

 “Q. And then, I believe, you told him to level off the roadbed? A. That is it.
 

 “Q. What instrument or tool did he have? A. He had a shovel.
 

 “Q. What kind of a shovel? A. Regular small shovel we use for loading.
 

 “Q. Steel shovel? A. Yes; steel.”
 

 The witness further testified as follows: “He must have been hit in the head. That is all I see. I say hit in the head because he had a hole in his cap and his cap laying a little ways away.”
 

 He also testified that the shovel Carden had had a wooden handle.
 

 We have quoted all the testimony in any wise bearing upon the crucial fact as to whether Carden had the steel shovel in his hand when he was struck by lightning, and we can find no testimony from which a logical conclusion could be drawn that he did have the steel shovel in his hand when struck by the fatal bolt.
 

 Griffin found his body. He saw no shovel. He did not have the rake. He said, “I think it was laying some little distance away.”
 

 Counsel for Mrs. Carden insist that Mrs. Goodman was the last person to see him alive; that he had a shovel when she saw him, and from that fact the trial court had the right to assume that he had the steel shovel in his hand when struck by lightning. Mrs. Goodman wobbles on this proposition. For the sake of argument, let it be granted that she was the last person who saw Goodman alive and at that time he did have a shovel, would it not be sheerest speculation to assume that he had the shovel in his hands when killed? When he was killed he was in a different place from where she last saw him. There was no shovel
 
 *355
 
 anywhere. True, according to Griffin’s best judgment, there was a rake some little distance away. If it were established that Carden even had a rake in his hands when struck, an amendment in furtherance of justice would take care of the situation; but there is not, adopting the language of a well known judge, now deceased, a “shimmer” of testimony along that line.
 

 To indulge the presumption contended for by counsel for defendant in error would flagrantly violate the rule sought to be applied. It is insisted that a condition once shown to exist is presumed to continue to exist until it is shown to be non-existent.
 

 The case of
 
 Western Ins. Co. of Cincinnati
 
 v.
 
 Tobin,
 
 32 Ohio St., 77, is cited in support of this contention. The law laid down therein at page 92 is unquestionably good law, viz:
 

 “If seaworthy when insured the presumption of seaworthiness would continue up to the time of her loss, unless some known intervening cause is shown that rendered her unseaworthy after she was insured.”
 

 To the same effect is the case of
 
 Richards
 
 v.
 
 Stratton,
 
 112 Ohio St., 476, at page 484, 147 N. E., 645. We find these words in the dictum of that case:
 

 “There is a presumption that a situation established continues until the contrary is shown”.
 

 In that ease it was sought to be shown that because a particular village ordinance was in existence on November 20, 1923, it was in existence two years prior thereto, at the time of injury. The court refused to apply the rule to the converse, and very properly so, as we regard it.
 

 The trouble is that counsel endeavors to give a limited rule unlimited application. The rule is succinctly and, as we regard it, correctly stated in 10 Ruling Case Law, 872, Section 15, viz:
 

 “When the existence of a person, a personal relation, or state of things is once established by proof,
 
 *356
 
 the law presumes that the person, personal relation, or state of things continues to exist as before, until the contrary is shown, or until a different presumption is raised from the nature of the subject in question.”
 

 Upon analysis it will be seen that this rule of presumption deals only with matters that are reasonably static in nature. To apply the rule to ephemeral matters would not only be the quintessence of asininity but would upset established rules of evidence, the wisdom of which has been tested in the crucible of legal philosophy.
 

 Adverting again to the testimony. Carden, to use the popular expression, was not strictly “on the job” when he was killed. He was on a ledge or bank some distance from the roadway, whence he had gone, presumably to see whether the water was rising in the sewer. It was not necessary for him to carry the rake or shovel to look at the sewer. This fact neutralizes the inference that he was using the rake or shovel when struck by lightning. There is nothing in the record to show that the handle of the shovel or rake was split, as in the
 
 Rochester case, supra.
 

 Altogether, we are totally unable to find any testimony from which the trial court could in any wise infer that Carden had the steel shovel in his hands when he was killed.
 

 Counsel for defendant in error further state,
 

 “We believe that even if this Court should find that there was no evidence that the decedent had the
 
 shovel in his hand,
 
 yet there is still other evidence tending to show that the hazard to the decedent was increased by reason of conditions growing out of and produced by the fact of his employment.”
 

 The only other conditions referred to were the wet clothing and wet ground. The trial court did not advert to the wet clothing and wet ground, and we will
 
 *357
 
 not consider factors that were not only not considered by the trial court, but were not urged.
 

 The judgment of the Court of Appeals will be reversed and final judgment entered for plaintiff in error, The Industrial Commission of Ohio.
 

 Judgment reversed.
 

 Weygandt, C. J., Williams, Jones, Matthias and Zimmerman, JJ., concur.