In the Matter of Gerald Glen
BOYDEN.

Misc. No. 483.

United States Court of Appeals
Ninth Circuit.

Oct. 24, 1955.

Chester TUSCHMAN, Nellie D. Tuschman and Helen J. Tuschman, Individually and as Co-Partners T/A Steel Baling Company,

v.

The PENNSYLVANIA RAILROAD
COMPANY.

No. 11755.

United States Court of Appeals
Third Circuit.

Argued Jan. 19, 1956.

Decided March 9, 1956.

F. Hastings Griffin, Jr., Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., for appellant.

A. Samuel Buchman, Philadelphia, Pa., for appellee.

Before GOODRICH, McLAUGHLIN and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

In this diversity action appellees, owners of a crawler crane, sued appellant, as a common carrier, for damage to the crane allegedly sustained while in appellant's possession. There was a verdict for the plaintiffs in the sum of $2,000. The trial court denied a defense motion for judgment n.o.v. and plaintiffs' motion to add interest to the verdict. The defendant appeals.

It is urged that the plaintiffs failed to prove where the damage occurred and that, even assuming some damage in transit, the evidence was too speculative to warrant submission to a jury.

On February 1, 1951, at Toledo, Ohio, appellant accepted the crane for shipment to plaintiffs-appellees at East St. Louis, Illinois. The bill of lading described it as in apparent good order and contained no exceptions. On its face it has a note "Loaded at Toledo Cartage

Co., E. Toledo, Ohio." Frank Tuschman, one of the plaintiffs, testified that when he first saw the crane in November of 1950 it was then in good operating condition and he purchased it on behalf of his firm for $6,000. He saw the crane again in the latter part of January, 1951, two or three days before it was shipped out. He said it was in the same condition at that time as when he had first observed it. He next viewed it at East St. Louis just prior to its being unloaded from a flat car of the terminal carrier. According to him the crane had run over the twelve inch timbers which had blocked it in the car. The crawlers were resting up on top of the timber and the bolts which had held the timber in place were broken. A couple of the treads were broken on the crane "[w]hether there were more than that broken or not I don't know, but I did see two from the top." He stated that the two clutches looked as though they had been broken with a hammer, two of the motor blocks were cracked, the operating lever seemed to have been cut with a torch and the radiator coil was broken. On cross-examination he testified that when he had inspected the crane in November, 1950, he could tell pretty well from the way it operated under a load there was nothing really worn in the crane. Cross-examination developed that necessary repairs to the crane were estimated by the people who built it to cost $5,371.10. Replacing 54 crawler treads alone, exclusive of labor and other necessary collateral parts, would cost $2,045.52. The witness described the broken radiator as looking like it had hit up against something. He said that in November, 1950, because of the winter weather, after his inspection of the crane the water had been drained out of its engine and radiator for shipping purposes. The witness said, "We knew that somewhere along the line it was bumped because of the fact that the crawler treads were up on top of the blocks at the time when the crane arrived."

The seller of the crane to the plaintiffs was with Frank Tuschman when the latter inspected it in November. He testified that the crane appeared in good working condition. He said it was worth from $6,000 to $8,000 and that he sold it to the Tuschmans for $6,000. The third and last witness on behalf of plaintiffs was a service engineer on contractors equipment whose deposition had been taken by the defendant but was read on behalf of the plaintiffs. In the latter part of February he had examined the crane in its damaged condition after shipment. He found 50% of the crawler treads broken, that the clutches and steering hand lever had been cut with a torch which he thought had happened more than six weeks prior to his inspection, the engine block was cracked and the radiator leaking. The witness said the crane had been manufactured in 1927.

Asked "In general what was your conclusion as to the cause for the condition you found the crane in?," the witness replied "Worn out." He thought the only value of the crane was for scrap metal—"junk price." He had made up a list of the repairs he found necessary to put the crane in running condition. The cost of these totaled $5,371.10. In his opinion none of the items needing repair had been damaged while in transit with the railroad nor did the latter have any connection with such damage. His estimate was sent to plaintiffs. The man he had met in the plaintiffs' office on the date of his examination later, according to the witness, asked him if he would testify that the repairs had been made necessary by the fault of the railroad and his answer had been no.

The first witness for the defense was the rigger superintendent for the cartage company which, acting for plaintiffs, had put the crane on the railroad car and blocked it in. He testified that a few pads were cracked or broken off and that all of the tread pads on one side would not turn, they just slid and that side could not be turned. Someone from the yard where the crane was standing took a torch "[a]nd went under there and cut it, cut it off with a torch, but that didn't help it, it was still stuck, froze."

The witness did not know what the trouble was. On cross-examination he said that the crane was not broken or damaged in hauling it to the flat car and that the inspector for the railroad approved its loading as proper. Because the crane's treads were so loose he thought it had a normal tendency to move up and back four or five inches. He had handled many cranes and commented that it was the worst crane he had ever loaded in his life. He said Mr. Tuschman had called him up and "He wanted me to testify for him in this case."

The railroad loading inspector said that the crane had been loaded better than the railroad loading specifications required. The foreman of the railroad shops at Toledo testified that some of the original blocks and cables holding the crane in position had become loose before the crane in the flat car left for East St. Louis. He said the crane had not been affected by this and that the blocks and cables were tightened in the shops. He examined the crane and did not see anything wrong with it. Car inspectors who checked the crane on its arrival at East St. Louis said that some of the blocking had again come loose during the trip but the load had only shifted eight inches and they found no recent damage to the crane. It was testified there had been no accident to or anything unusual in connection with the flat car on the trip to East St. Louis.

The damage report of the railroad was in evidence. It reads: "Apparent cause of damage—block in front of caterpillar not large enough, caterpillar moved forward slightly and rolled over the block onto a large bolt and was broken. Block is approximately 12 inches high while caterpillar treads are approximately 22 inches high."

■■■ Appellant argues there is no presumption as urged by appellees that the crane continued in the same condition on the date of delivery to the carrier as it had been when Tuschman saw it two or three days previously. This was an interstate shipment. The crane was transported under a bill of lading authorized by the federal Bill of Lading Act of 1916, 49 U.S.C.A. § 81 et seq. The railroad was liable under the Interstate Commerce Act, 49 U.S.C.A. § 20(11), for damage caused by it. The question of responsibility under the bill of lading is a federal one to be resolved by application of general principles of common law. Southern R. Co. v. Prescott, 1916, 240 U. S. 632, 640, 36 S.Ct. 469, 60 L.Ed. 836. We find no support for the above stated presumption in Ohio where the contract was executed, Industrial Commission of Ohio v. Carden, 1935, 129 Ohio St. 344, 195 N.E. 551. St. Louis-San Francisco R. Co. v. Glow Electric Co., 1929, 35 Ohio App. 291, 172 N.E. 425. Nor in Pennsylvania where the case was tried. Del Gaizo Distributing Corp. v. Gallagher, 1937, 127 Pa.Super. 53, 57, 192 A. 144. And not in any other jurisdiction which we have seen. Swiney v. American Exp. Co., 1909, 144 Iowa 342, 115 N.W. 212, 122 N.W. 957; Chesapeake & O. R. Co. v. W. C. Crenshaw & Co., 148 Va. 48, 138 S.E. 467; Herman v. Railway Express Agency, 1951, 17 N.J.Super. 10, 85 A.2d 284; Yuspeh v. Acme Fast Freight, La. App.1951, 54 So.2d 866, affirmed 222 La. 747, 63 So.2d 743. The law is clear that in this type of claim plaintiff has the burden of showing that the merchandise involved was in better condition when received by the carrier than on its delivery to the consignee. Ohio Galvanizing & Mfg. Co. v. Southern Pac. Co., 6 Cir., 1930, 39 F.2d 840, 841, certiorari denied 282 U.S. 879, 51 S.Ct. 83, 75 L. Ed. 776.

It is also contended by appellant that the bill of lading affords no assistance to plaintiffs in their effort to prove their crane was turned over to the railroad in good condition. In the printed receipt clause the railroad does acknowledge its "apparent good order except as noted" and made no exceptions. Appellant asserts that its acknowledgement correctly stated that fact because the damage to the crane as disclosed by the later survey was never shown to be "apparent". In view of what Tuschman said of the dam-

age after the crane had arrived at East St. Louis and of the engineer's testimony the question of what damage was visible and could be readily ascertained was for the jury. As to the treads the engineer testified that 54 of these were broken. Replacement of them and their collateral parts according to the survey would have cost $3,195.12 plus a substantial part of the labor charge of $1200 for installing a total of $4,171.10 worth of parts.

■ The acknowledgement by the bill of lading of the crane's apparent good order was prima facie evidence that, as to all parts which were open to inspection and visible, the crane was in good order at the point of origin. This did not preclude the railroad from showing that the alleged damage in whole or part proceeded from some cause or causes which existed, but were not apparent when it received the crane. Nelson v. Woodruff, 1861, 1 Black. 156, 66 U.S. 156, 158, 17 L.Ed. 97. See also The Ponce, D.C.N.J.1946, 67 F.Supp. 725, 728 affirmed sub nom. Pompeian Olive Oil Corporation v. SS. Ponce, 3 Cir., 1947, 160 F.2d 107 and cases collected 33 A.L.R.2d 872, § 3. While we have found no Ohio decision directly on the point the opinion in St. Louis-San Francisco Ry. Co. v. Glow Electric Co., supra, gives some indication that Ohio would follow the view expressed.

■ It is suggested by appellant that even if the condition of the various parts of the crane had been apparent when it was turned over to the carrier the bill of lading could not be used as an admission that these were in "good order". This because the crane was undoubtedly loaded by the shipper's agent and under the federal Bills of Lading Act of 1916, 39 Stat. 541, 49 U.S.C.A. § 101: "The carrier may also by inserting in the bill of lading the words 'Shipper's weight, load, and count,' or other words of like purport, indicate that the goods were loaded by the shipper and the description of them made by him; and if such statement be true, the carrier shall not be liable for damages caused by * * * the

misdescription of the goods described in the bill of lading * * *." None of the statutory language is on this bill. In particular there is no evidence that the shipper ever furnished a description of the crane to the carrier. The quoted language of the Act simply has no application to the bill of lading in suit.

Appellant maintains that the evidence regarding the crane's condition at its Toledo shops is of no importance on the theory that it had merely to do with the apparent good order of the crane whereas the damage was not open to inspection and visible, was in reality hidden. The record reveals that the gang foreman of the railroad's Toledo shops, the person who straightened the blocking on the car that held the crane and who tightened the cables, was asked on cross-examination:

"Now, you said you examined this crane and you didn't see anything wrong with it?"
And he answered:
"No."

On redirect examination the witness was asked "When you say you examined it, did you make a detailed examination or did you just make an external examination?" And he replied: "I just made external examination just from the ground, just looking at it, that is all." Actually from his own story he had been up in the car with the crane where he had replaced its blocks and tightened the cables holding it.

■ The foreman's testimony of itself is some evidence of the crane's condition prior to starting its journey to East St. Louis and while it was under the control of the carrier. Covering as it does his inspection some days after the railroad had received the crane it brings this case very close to the special circumstances of Bronstein v. Pennsylvania R. R., D.C.E.D.Pa.1940, 33 F.Supp. 716. In addition it provides a connection with Tuschman's evidence that the crane had seemed in good condition when he last saw it in Toledo and with the bill of lading acceptance of the crane in "apparent good order".

Since there was a fact issue concerning where at least part of the damage had occurred we come to the second branch of the appeal, that the damages were too speculative for ascertainment.

■ The vendor of the crane qualified as an expert in the buying and selling of cranes. He valued it as of November, 1950, at from six to eight thousand dollars. Plaintiffs purchased it for six thousand dollars. The estimate to put it back in running condition, made after it reached East St. Louis, was $5,371.10. As it stood there it was designated as fit for scrap. There was evidence that prior to delivery to the railroad an acetylene torch had been used to cut some unidentified part or parts of the crane and more evidence that certain parts did look as though they had been thus cut. Tuschman related that at East St. Louis he knew that somewhere along the line the crane had been bumped for it was up over the blocks and he saw a couple of treads broken and there might have been more. The engineer specifically mentioned that 50% of the crawler treads were broken and that 54 treads should be replaced. We have already given the figures for the replaced treads, their adjunct parts and labor cost. These amounted to around four thousand dollars. The jury awarded two thousand dollars. The evidence of damage attributable to the railroad was scant, it had to be pieced out carefully, it was strongly contradicted and grave doubt cast on its credibility but the result indicates that it was believed by the jury to the extent of the verdict. It is sufficient to sustain the judgment on appeal.

■ We are asked by appellee to mould the judgment to include interest. The district judge refused to charge a similar request. Later he denied a motion to reopen the judgment for that purpose. No appeal was taken from those rulings and consequently there is nothing before us. Bochterle v. Robbins, Inc., 3 Cir., 1947, 165 F.2d 942, 944–945.

The judgment of the district court will be affirmed.