**DUGDALE PACKING COMPANY,
Plaintiff,**

v.

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a corporation, Defendant.**

**Civ. No. 1580.**

United States District Court,
W. D. Missouri,
St. Joseph Division.

Sept. 22, 1972.

Brown, Douglas & Brown, St. Joseph, Mo., for plaintiff.

Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

DUNCAN, District Judge.

The plaintiff is a corporation organized under the laws of the State of Missouri, with its principal place of business at St. Joseph, Missouri, and is engaged in the meat packing business. Defendant is a foreign corporation operating a line of railroad running into the City of St. Joseph. Plaintiff seeks the sum of $14,169.34 for damages alleged to have resulted from spoilage of a shipment of meat due to the defendant's failure to furnish a suitable refrigerated trailer for the transportation of such meat.

The matter is before the Court on stipulation of facts. The material facts, as set out in the stipulation are that prior to 1964 the plaintiff Dugdale frequently shipped some of its meat products over the Santa Fe line using refrigerated cars furnished by the Santa Fe.

During the year 1964 Dugdale began shipping its products over the Santa Fe lines by using what is commonly known as the "piggy-back" method of transportation. Under such circumstances Dugdale loaded its products into refrigerated truck trailers owned and delivered by Santa Fe to the Dugdale plant. After the trailers were loaded and ready for shipment, Santa Fe would pick them up at the Dugdale plant and load them on flat rail cars for transportation to their various destinations.

Shortly after the piggy-back method of transportation was adopted by Dugdale and Santa Fe in 1964, by mutual agreement of the parties, Santa Fe would set piggy-back trailers on Dugdale's parking lot in advance of any request from Dugdale for such trailers. Santa Fe regularly maintained two to five refrigerated trailers on Dugdale's lot which trailers were to be loaded by Dugdale when needed.

Santa Fe was fully familiar with the nature of the products produced by Dugdale, knowing that they must be transported in refrigerated trailers or they would spoil.

Santa Fe operated a freight train out of St. Joseph leaving at 5:00 p. m. each week day. No train was operated on Sunday.

Customarily Dugdale loaded the trailers on a day-to-day basis. When one of the trailers was to be loaded it would be hauled by Dugdale from the lot, where it had been left by the Santa Fe, and conveyed to its dock for loading. After the trailer had been loaded it would be sealed and moved from the loading dock back to the parking lot by Dugdale. Dugdale's traffic manager would then notify Sante Fe by telephone that one or more trailers were ready for shipment. All the necessary papers including the

weight sheet were prepared by Dugdale and placed in the trailer prior to sealing. Loaded trailers would then be taken away by Santa Fe for loading upon flat cars for transportation to their destinations. The bill of lading would be delivered to Santa Fe and a Santa Fe driver would sign for the load before it was hauled away from the Dugdale lot, in time to be loaded for movement on the 5:00 o'clock train.

It was the practice that if trailers were loaded on Saturday too late to meet the 5:00 o'clock train, no notice was given to Santa Fe until Monday morning, at which time the usual telephone notice was given.

On Saturday, June 25, 1966 at about 7:00 o'clock p. m. Dugdale loaded a Santa Fe piggy-back trailer which had been left on the Dugdale lot. The number of the trailer was SFTZ 500316 and the trailer was serviced by a Thermo-King unit with no serial number, but with compressor number 21462. The load consisted of beef sides from fifty butchered steers, weighing a total of 36,318 pounds. The invoice value was $14,706.-77.

The trailer was loaded too late to meet the 5:00 o'clock train, and since June 25 fell on Saturday, the trailer was not to be picked up until Monday. All papers in connection with the shipment were completed at the time of loading, except the bill of lading, and the trailer was sealed. It was placed on Dugdale's lot and the refrigerating unit was set to maintain a temperature of between 34° and 38° F. No bill of lading covering this trailer was ever delivered to the Santa Fe.

On Sunday morning Dugdale's refrigeration mechanic reported for work at 8:15 a. m. for the purpose of checking on semi-trailers which had been loaded and parked on the lot awaiting shipment. There were nine units on the lot at that time, one of which was the unit involved in this litigation. The unit was checked and found to be running in good order and maintaining the proper temperature. The mechanic left the lot at 10:45

o'clock Sunday morning after inspecting the various units. The mechanic ascertained by his check that the unit had sufficient fuel supply.

On Monday morning, June 27 at about 6:00 a. m., it was discovered that the load in this unit had heated to 105° and that the entire shipment of meat was badly spoiled, showing bacterial action and bloating. The meat was inspected by a U. S. Government meat inspector and the entire shipment was condemned.

On Monday afternoon, June 27, pursuant to a call, A.C.O. Motor Supply, Inc., of St. Joseph made a check of Santa Fe trailer No. 500316, Compressor serial number 21462. The inspection revealed that the three-way valve in the refrigeration unit was stuck on the "heat or defrost cycle" causing the unit to heat continuously resulting in the spoilage of the meat. The shipment was sold by Dugdale to the Terminal Warehouses of St. Joseph at a loss of $13,-358.34.

The trailer was "pre-tripped" and inspected at the Argentine, Kansas, yards of the Santa Fe by Santa Fe's mechanical department on June 18, 1968, and the refrigeration equipment, including the valve, was found to be functioning properly at that time. The Santa Fe had no one on duty between Saturday, June 25 and Monday morning June 27 who could have received the bill of lading, or who could have inspected the trailer. There was no customary practice for Santa Fe to inspect loaded trailers at the Dugdale plant or on the Dugdale lot.

Since the advent of the piggy-back method for the shipment of meat products it has become customary for all railroads to deliver their piggy-back trailers to the various packing companies where they are loaded by the companies. The trailers are then picked up by the various railroads and loaded on trains for shipment.

In a supplementary stipulation of facts it was agreed that if R. S. O'Neale was called as a witness he would testify that in 1966 he was the district sales manager in the traffic department of the Santa Fe in charge of the traffic office in St. Joseph, and that he was familiar with the shipments made by Dugdale as set out in the stipulation paragraphs 4 to 11 inclusive. He would further testify that prior to June 25, 1966 the shipments described in the stipulation had usually and customarily been made under Plan 2¼ which is a plan whereby defendant furnishes the pick up and delivery service of the trailer at point of origin but not at point of destination, that a copy of Item 3208 and Tariff 450–D attached to the stipulation were the applicable regulations on June 25, 1966 for shipments moving under said Plan 2¼ and that there was no custom or practice for Santa Fe employees to inspect loaded trailers on the Dugdale lot.

It was further stipulated that Robert Miller, traffic manager of Dugdale, if called as a witness would testify that he was the traffic manager in 1966, that shipments from Dugdale over the Santa Fe generally moved under Plan 2¼, but he, Miller, never heard of the Item 3208 of Tariff 450–D, that he was never advised by anyone on behalf of Santa Fe that Dugdale was to take care of the shipments, and that Santa Fe employees customarily came down and checked the Santa Fe equipment on Dugdale's lot.

If Dave Logan, Secretary of Dugdale was called as a witness, he would testify that he was in charge of operations in 1966, that shipments made by Dugdale over Santa Fe as described in the stipulation were customarily made, that he never heard of Item 3208 of Tariff 450–D, that he was never advised on behalf of the Santa Fe that Dugdale was to take care of equipment while on Dugdale's lot, and that customarily the equipment from time to time was checked by Santa Fe's own employees.

Tariff 450–D, heretofore referred to as a part of Plan 2¼ provided among other things that:

"Note 2.—Any necessary protection against heat or cold will be furnished by carrier and at its expense for the movement from origin to final des-

tination ramp. Consignor or consignee shall take full responsibility for and assume all expenses of protective service while trailers are in possession of consignor, Consignee or consignor, or consignee's agent. Trailer will be supplied by the carrier, and rail carriers will load trailer onto the flat car and unload the trailer from the flat car."

A summary of the essential facts as stipulated shows that after Dugdale began using the piggy-back system of transporting its product, the railroad kept from two to five trailers at Dugdale's plant on its lot at all times ready for loading. It may be assumed that the arrangement was for the mutual benefit and convenience of both parties. It resulted in a trailer always being available for immediate loading. The railroad knew that the trailers were to be loaded with meat and meat products and that without proper refrigeration the contents would spoil.

When a trailer was to be loaded it was moved by plaintiff from the parking lot to the dock or area where the loading was to take place. When the loading was completed the plaintiff notified defendant and defendant moved the trailer and placed it on rail cars for delivery. Prior to moving such trailer plaintiff prepared all necessary papers pertaining to the shipment, including the bill of lading. The trailer was sealed before being replaced on plaintiff's parking lot where it awaited pick up by the defendant.

Plaintiff was familiar with the fact that defendant's train left at 5:00 p. m. each day except Sunday, and that any trailer not loaded in time to make the 5:00 o'clock deadline, would not be moved by defendant until the next day. Plaintiff was also aware that by custom and practice trailers loaded too late to be picked up by defendant for loading on the 5:00 o'clock train on Saturday would not be picked up by defendant until Monday. Consequently plaintiff would not notify defendant of such a trailer's readiness for pick up until Monday morning. Defendant did not inspect any trailer after it had been loaded on plain-

tiff's premises prior to delivery to defendant. The stipulation reveals that the trailer in controversy was handled in the usual and ordinary manner.

■ The supplemental stipulation setting out what the three persons named therein would testify to clearly establishes that all the shipments by Dugdale were made under the "Plan 2¼". The two employees of Dugdale say they never heard of Item 3208 of Tariff 450–D, yet it is the tariff of which Plan 2¼ is a part. 450–D, being the tariff under which the shipment was made, became a part of any agreement for the transportation of such shipments and it became binding upon the plaintiff regardless of knowledge concerning its existence. Item 3208 was a part of Tariff 450–D and pertained to "Rules in Connection with Rates to Ramp Points", and Plan 2¼ provided [c]onsignor or consignee shall take full responsibility for and assume all expenses of protective service while trailers are in possession of consignor, consignee, or consignor or consignee's agent".

In its brief the plaintiff bases its right to recover upon two theories, first, that under the admitted customs and usage delivery of the shipment had been completed when the loss occurred, and second, that the trailer delivered to the plaintiff was not in perfect condition, and that this constituted a breach of the defendant's legal duty to furnish a suitable car for the carriage of the particular goods.

■ We will first consider plaintiff's contention that there had been delivery to the defendant. In order for the legal relationship of carrier and shipper to be established, complete delivery must be made by the shipper to the carrier. When such delivery has been made and the shipment has been accepted by the carrier its liability as a common carrier commences at that time. National Union Fire Ins. Co. v. Atlantic & East Carolina R. Co., 193 F.2d 943 (4th Cir.). As stated in 13 Am.Jur.2d § 256, p. 763:

"The delivery of goods to a carrier occurs and is completed when they are

ready for, and have been placed in the exclusive possession, custody, and control of the carrier for the purpose of, their immediate transportation, and the carrier has so accepted them. * * There can be no complete delivery where something remains to be done upon the part of the shipper constituting a condition precedent to the actual commencement or transportation by the carrier."

A question similar to the one presented in this case was before the Court in Republic Carloading and Distrib. Co. v. Missouri Pacific R. Co., 302 F.2d 381 (8th Cir. 1962). In that case Judge Blackmun stated, at page 385:

"In order that a railroad have the status and absolute liability of a common carrier with respect to a shipment, the shipper must have delivered the freight into its possession, the delivery must be for immediate transportation, and the shipper must give the carrier appropriate shipping instructions.

\* \* \* \* \* \*

It follows that the Missouri Pacific does not have common carrier liability with respect to losses of these first category shipments. These shipments were not even handled by the railroad. They were, instead, delivered by the local truck driver to Republic at the depot and were receipted for there by Republic's receiving clerk. *There was no delivery to the railroad for immediate transportation; there was no bill of lading yet issued by the outbound carrier; and there were no complete shipping instructions yet issued by Republic as shipper."* [Emphasis supplied]

■ In the present case all of the necessary elements to comply with the law to effect delivery are absent. The trailer had been loaded at about 7:30 p. m. Saturday, June 25, too late to meet the 5:00 o'clock train schedule. Plaintiff well knew that the trailer could not be picked up by the railroad until the following Monday morning. Following loading at the loading dock all necessary papers in connection with the shipment were completed except the bill of lading, and the trailer was sealed and moved by the plaintiff to its parking lot. No bill of lading or shipping instructions were ever delivered to the defendant. All of the operations with respect to the loading, sealing and the moving to the parking lot were performed by the plaintiff, and there is no suggestion in the stipulation that the defendant had any connection with or any knowledge of the loading or the movement of the trailer following the loading. The trailer remained in the exclusive possession of the plaintiff, no shipping instructions had been issued, no bill of lading had been delivered to the railroad, and no notice had been given by the plaintiff that the trailer had been loaded.

Therefore, there was no delivery and no liability can attach to the defendant on that ground.

■ Plaintiff's second contention is that defendant failed to furnish a safe and suitable trailer considering the nature of the product to be shipped. The general rule is that when a common carrier has held itself out as carrying any particular class of goods, it must provide cars or other vehicles, as the case may be, which are suitable for the carriage of such goods. Jones v. Thompson, 360 Mo. 285, 228 S.W.2d 673; 13 Am.Jur.2d § 168, p. 695. The defendant was accustomed to hauling plaintiff's products and knew the requirement as to type of equipment necessary to protect it from spoilage during transit.

This case presents more than the usual question of intransit carrier liability, it presents a question of precedent carrier liability for furnishing what plaintiff contends was a defective trailer, which resulted in damage to the shipment still in the possession of the shipper. We have not been cited any specific authority dealing with a factual situation of this type.

■ A common carrier is liable to a shipper for loss of perishable goods where the loss is attributable to the unsafe or unfit condition of the vehicle

furnished. It was a refrigerated trailer suitable for the transportation of fresh meat, equipped with a refrigeration unit. The question here centers around the proper maintenance of the unit.

The stipulation states that the trailer had been moved from the lot and loaded at approximately 7:00 o'clock p. m. on Saturday evening with beef sides from 50 steers, weighing 36,318 pounds. After loading the trailer was placed on Dugdale's lot by Dugdale and the refrigerator unit was set to maintain a temperature of between 34° and 38° F.

The next morning, Sunday, at about 8:15 o'clock Dugdale's refrigerator mechanic reported to work for the purpose of checking on the semi-trailer which had been loaded and parked on the lot awaiting shipment. There were nine of them, one of which was the Santa Fe trailer in question. The stipulation recites that when the unit was checked on Sunday morning, it was found to be running in good order, maintaining the proper temperature, and having an adequate supply of fuel. On Monday morning about 6:00 o'clock it was discovered that the trailer had heated up to 105° F. and that the entire load of meat was spoiled, showing bacterial action and bloating.

The stipulation is silent as to how the unit functioned on Saturday evening when the temperature controls were set, but we may assume that if it was properly functioning the next morning at 10:45 o'clock, it had properly functioned during the interim. If the unit, including the three way valve, was in good operating order when it was activated on Saturday evening, and we must assume that it was or this fact would have been discovered by plaintiff's employees, and the unit continued to function properly until 10:45 the next morning, which was confirmed by plaintiff's inspection, then it is reasonable to assume that the trailer was suitable and not defective when delivered to plaintiff.

We believe that under the facts in this case the burden is upon the plaintiff to show that the trailer was not suitable for the purpose for which it was intended, and that the plaintiff has not met this burden.

We therefore conclude that judgment must be entered for the defendant.