**BLUE BIRD FOOD PRODUCTS CO.,**
Appellant,

v.

**BALTIMORE & OHIO RAILROAD COMPANY.**

Nos. 73–1684 through 73–1687.

United States Court of Appeals,
Third Circuit.

Argued Nov. 30, 1973.

Decided Feb. 19, 1974.

---

Robert C. Cohen, Walter W. Rabin, Meltzer & Schiffrin, Philadelphia, Pa., for appellant.

Alan Edward Casnoff, Frederick H. Ehmann, Jr., Norman R. Bradley, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for appellee.

Before ADAMS and ROSENN, Circuit Judges, and SHERIDAN, District Judge.

## OPINION OF THE COURT

PER CURIAM.

This appeal, which brings these parties before this court for the second

time,[1] involves four actions[2] filed by plaintiff-consignee, Blue Bird Food Products Co. (Blue Bird), against defendant-carrier, Baltimore & Ohio Railroad Company (B&O), for alleged damage to four carloads of fresh hams shipped by midwest meat packers via defendant to plaintiff in Philadelphia. The action is brought under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 20(11). The issue presented is whether the introduction of a bill of lading with the notation,

> Received, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading, . . . the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) . . . .

is sufficient to establish the good condition of the lading at the time it was delivered by the shipper to the carrier. The district court, both in its initial opinion and on remand, held that it was not. Having considered the contentions of the parties, we affirm the judgment of the district court.

The facts necessary to our decision are as follows.[3] The four carloads at issue were shipped from the midwest to the Philadelphia destination point pursuant to a "piggy-back" transportation operation where trailers are hauled to the destination on railroad flatcars. As developed in testimony before the district court on remand, the mode of shipment designated by the shipper in these cases required the shipper to load a trailer furnished by the carrier. The district court found as facts:

1. When the shipper was ready to load the trailer, it contacted a "spot-ter" (a railroad agent who is on the shipper's premises) who backs the trailer to the shipper's loading dock.

2. The hams were individually loaded by the shipper, one piled upon the other, so that when loading was completed, the hams extended from the front to the rear of the trailer to a height of approximately three to four feet.

3. Subsequent to loading but prior to the doors of the trailer being sealed, only the rear portion of the contents of the trailer were "open and visible" and the subject of a reasonable inspection.

4. When loading is completed the trailer is pulled away from the loading dock, the rear doors are closed and the shipper places its seal upon the doors of the trailer.

5. The seal affixed by the shipper is a small, thin metal band which locks when one end of the band is snapped into the other end.

6. The trailer is then driven to a location upon the shipper's premises.

7. Upon notification that the plaintiff was ready to ship the load, the railroad's drayman was dispatched to the plant site.

8. Upon his arrival, the drayman hooks his cab to the trailer, inspects the seal, refrigeration system and the outside of the trailer.

9. This inspection revealed no evidence of visible damage to the refrigeration system or the outside of the trailer.

\* \* \* \* \* \*

---

1. This case was first before this court on Blue Bird's appeal from the district court's entry of judgment, after a three day non-jury trial, for B&O. The district court's original opinion is reported at 329 F.Supp. 1116 (E.D.Pa.1971). Our opinion on Blue Bird's first appeal is reported at 474 F.2d 102 (3d Cir. 1973). The district court's "Additional Findings of Fact, Discussion and Conclusions of Law" and subsequent "Memorandum Opinion and Addendum" on remand are unreported. Blue Bird Food Products Co. v. Baltimore & Ohio Ry., Nos. 70–1699, 1744, 1880, 2661 (E.D.Pa., filed June 5, June 22, 1973).

2. The cases were tried in a single proceeding and were consolidated for the purposes of appeal.

3. The facts appear in greater elaboration in our opinion on Blue Bird's first appeal. *See* note 1 *supra.*

11. The trailer was then driven from the plaint [sic] site to the piggyback train for cross country transit.

12. The seals applied at origin were not broken until their arrival at the Bluebird plant in Philadelphia.

13. The tariff applicable to the shipments involved in the instant cases is Tariff 450 D of Western Trunk Lines, and the Plan under which the shipments were sent is commonly known as Plan 2¼.

14. Under Plan 2¼ it is the obligation of the shipper to load the trailer "subject to carrier's supervision."

As more fully set forth in our opinion in the original appeal, the lawful holder of a bill of lading makes out a prima facie case of liability for damaged goods against a carrier by proving delivery of goods in good condition, arrival of goods in damaged condition and the amount of damages. 474 F.2d at 104. In the present case, Blue Bird produced no direct evidence of the condition of the hams on delivery to the carrier. Instead, Blue Bird introduced the bills of lading under which the goods were shipped and, relying on our decision in Tuschman v. Pennsylvania Railroad, 230 F.2d 787 (3d Cir. 1956),[4] contended that the carrier's representation of receipt "in apparent good order" created a prima facie case of delivery of the goods in good condition. The district court, in its initial opinion, rejected this argument. It determined that when merchandise is delivered to a carrier in a sealed trailer, it is not "open and visible." It held that in these circumstances the consignee who sues the carrier for damages to the goods cannot establish a prima facie case by means of the "apparent good order" representation in the bill of lading but instead must "establish by direct evidence that

the goods were delivered to the carrier in good order." 329 F.Supp. at 1118.

On the initial appeal, we held that the district court's implicit finding that the trailer was "sealed" was clearly erroneous and remanded for further findings on that issue. In addition, we requested that the court supplement the record with findings of fact and conclusions of law on issues including:

A. Was any part of the contents of the trailer "open and visible" in light of the time and condition of its being sealed and the party responsible for such sealing?

B. Is there a custom governing the sealing of such trailers shipped under Plan 2¼ . . . ?

474 F.2d at 107, n. 16. On remand the district court made additional findings of fact as noted above and again concluded that Blue Bird "has failed to prove that the cargo was delivered to the [carrier] in good order."

On this appeal, Blue Bird makes two contentions. First, it argues that the shipper's delivery of a trailer sealed with a "small thin metal band" to the carrier's drayman does not preclude an internal inspection of the container. Second, it argues that the carrier had an opportunity to inspect the lading prior to the sealing of the trailer, either as the goods were being loaded or after loading but before the seals were affixed.

The district court rejected Blue Bird's first contention on the basis "that a shipper who uses any device to seal a trailer indicates to a carrier that the cargo was properly loaded; that the goods are in good order and the carrier is not obligated to inspect the cargo."

We have carefully reviewed the record in this case and we find no error in the district court's ruling. The

---

4. In *Tuschman* we stated:

The acknowledgment by the bill of lading of the crane's apparent good order was prima facie evidence that, as to all parts which were open to inspection and visible, the crane was in good order at the point

of origin. This did not preclude the railroad from showing that the alleged damage in whole or part proceeded from some cause or causes which existed, but were not apparent when it received the crane. 230 F.2d at 791.

record shows that the seal serves as a type of security device providing the shipper's assurance to the consignee that the load has not been tampered with from the time it left the shipper's premises. The practice of carriers to break the seal in case of an emergency, when requested by the shipper, or when there is a history of recurring loss with the shipper, does not, in the absence of specific shipper's instructions, impose upon the carrier the duty to also break the seal for purposes of inspecting the contents of the trailer.[5]

We are unable to agree with Blue Bird's second contention. Under Plan 2¼ the shipper loads the trailer at its plant site. After loading and sealing, the railroad's drayman is notified by the shipper to pick up the trailer. The carrier receives the trailer and assumes responsibility for the goods only after the trailer is loaded, sealed and released to the shipper. Any obligation of the carrier to inspect, in the absence of specific arrangements otherwise, would not commence until it takes possession of the goods.

> In order that a railroad have the status and absolute liability of a common carrier with respect to a shipment, the shipper must have delivered the freight into its possession, the delivery must be for immediate transportation, and the shipper must give the carrier appropriate shipping instructions.

Republic Carloading and Distributing Co. v. Missouri Pacific R.R. Co., 302 F. 2d 381, 385 (8th Cir. 1962); *see,* Dugdale Packing Co. v. Atchison, Topeka and Santa Fe Ry. Co., 347 F.Supp. 1276 (W.D.Mo.1972). As heretofore noted, such inspection would not include, absent specific instructions from the shipper, breaking the seal for an interior examination of the cargo. Under the circumstances, we are unable to conclude that the carrier had any duty to inspect the cargo[6] on the shipper's premises prior to notification that the cargo was ready for shipment.

The judgment of the district court will be affirmed.

5. B&O argues that even if the seal were required to be broken, and the doors opened, the manner of loading and the possible existence of a nondetectable microorganism precluded the lading from being "open to inspection and visible." Because of our disposition of this case on other grounds, we need not rule on this contention.

6. Blue Bird argues that the tariff provides for an inspection, citing the following provision, stipulated by the parties to be relevant to the shipments under consideration:

> Where rates are provided in tariff that do not include loading or unloading, or which provide that shipper is to load or consignee to unload, such rates will be applied . . . only when shipper or consignee, as the tariff item may provide, performs the entire physical or mechanical service of such loading or unloading, *subject to carrier's supervision.* [Emphasis supplied.]

We do not find this language inconsistent with our decision. It would appear that this clause *permits* supervision by the carrier over the shipper's loading practices to assure safety in transportation and avoid damage to the carrier's property. It does not *require* an inspection of the condition of the goods.