468 F.Supp. 615 (1979)
KAISER ALUMINUM & CHEMICAL CORPORATION, Plaintiff,
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY, Defendant.
No. 77-976C(B).
United States District Court, E. D. Missouri, E. D.
March 22, 1979.
Edwards, Seigfreid, Runge & Leonatti, Jerome W. Seigfreid, Lewis J. Leonatti, Mexico, Mo., W. Munro Roberts, Jr., Roberts, Heneghan & Coffelt, Inc., St. Louis, Mo., for plaintiff.
Greenfield, Davidson, Mandelstamm & Voorhees, Alphonso H. Voorhees, Lawrence *616 N. Doreson, St. Louis, Mo., Daniel M. Dibble, Kansas City, Mo., for defendant.

MEMORANDUM OPINION
REGAN, District Judge.
In this action brought under the Carmack Amendment (49 U.S.C. Section 20(11), the issue is whether, and if so to what extent, a shipment of calcined refractory bauxite became contaminated and worthless to plaintiff while in the custody and control of defendant, a common carrier by rail. It is plaintiff's contention that the railroad cars furnished by defendant to transport the bauxite had not been adequately cleaned of their previous cargos, with the result that the bauxite became contaminated.
Calcined bauxite is the principal material used in the manufacture of refractory brick. Plaintiff, which manufactures refractory brick at its plant in Mexico, Missouri, purchased the bauxite through Philipp Brothers from the Guyana Bauxite Company, Ltd. in Guyana, South America, for delivery FOB railcars at Mobile, Alabama.
The parties have stipulated that on May 16, 1975, the motor vessel Arrow Crane was loaded in Guyana with 16,000 metric tons of calcined bauxite. Of this load, 4,272.158 metric tons were consigned to plaintiff's Mexico, Missouri, plant, the balance being consigned to other companies purchasing bauxite through Philipp Brothers. Prior to the vessel's arrival, Philipp Brothers notified defendant as to the time the ship would arrive, requesting that the railroad arrange to furnish clean, covered, hopper cars suitable for transporting the cargo of bauxite ore. Calcined bauxite is highly susceptible to contamination.
The Arrow Crane arrived at the Port of Mobile on May 23, 1975. By that time, defendant had assembled a number of cars and had them on hand, empty, ready for loading when the ship came in. It was the normal practice of defendant to inspect and clean its cars before furnishing them to its customers. There is no affirmative evidence as to whether it did so as to the cars assembled on this occasion. However, it had been the custom and practice of Philipp Brothers over a period of years to have one of its representatives (in this instance Stanley Malabud) personally inspect each car tendered by defendant for loading to determine its suitability for shipping bauxite, rejecting those he felt were unclean and not suitable. Of those tendered in this case, Malabud rejected five to ten cars as containing impurities or foreign matter, and these were accepted back by defendant. The remaining cars were approved by Malabud for loading.
The entire dock and storage area where the Arrow Crane docked and where the railroad cars were loaded, as well as all equipment and vehicles used in the loading and storage of ore, were wholly owned, controlled and operated by the Alabama State Docks, a public agency of the State of Alabama.[1] The railroad cars which were accepted by Philipp were, as was the practice, initially brought to a designated joint interchange track, approximately a mile from the actual loading site.
No representative of the defendant is present or participates in the loading process. The practice is for Alabama State Docks personnel, under the supervision of the shipper or its agent, including Philipp Brothers, to load the cars from the ship, and weigh and count the cars. After they are loaded, the rail cars are then interchanged to the defendant by Alabama State Docks personnel at the joint interchange track. Not until this is done does the railroad receive the bill of lading from the shipper or its agent.
For whatever reason, the total number of cars initially assembled by defendant was not sufficient to load the entire cargo of the Arrow Crane,[2] so that although sixty-three *617 cars were necessary to load plaintiff's portion of the cargo,[3] only fifty (covered hopper) cars consigned to plaintiff were loaded from the ship. After all available cars were loaded, the remainder of the ore was removed from the bottom of the ship's hold into dump trucks and deposited a short distance away on a concrete pad and covered, at the instance of Malabud, with a plastic sheet. Malabud then departed Mobile to attend to other business without making any arrangements either for an inspection of the cars which defendant was to furnish later or to supervise the loading of the remainder of the bauxite for shipment to plaintiff.
Several days later, plaintiff was advised by defendant that the only cars then available were open top hoppers. Although covered hopper cars are the only ones customarily used for transporting bauxite, the use of the open top hoppers were acceptable to plaintiff. Thereafter, the remaining bauxite ore was loaded from the concrete pad by Alabama State Docks' personnel onto 13 open top hopper cars which, after the usual interchange, transported the bauxite to plaintiff's plant at Mexico, Missouri.
Of the 50 cars which had been loaded directly from the ship for plaintiff, only one was the subject of a contamination claim. When that car was unloaded, a white substance (later determined to be tripoli) was observed.[4] This car was one of those which Malabud had personally inspected and found by him to be clean and suitable for loading.
Of the second group of cars (those which transported the ground stored bauxite), eleven (eight of which were unloaded) were the subject of a contamination claim. A red rock substance, later determined to be iron ore, was observed by plaintiff's employees in the contents of some of the eight cars during the unloading process. As held infra, we do not credit the trial testimony of witness Charles Jackson that he observed red contaminants in all eight of the cars.[5]
The other three open hopper cars were not unloaded, and although plaintiff's employees had observed no evidence of contamination in them upon a visual topside inspection, they were nevertheless claimed to be contaminated. Based solely on plaintiff's representation that the contents of these cars were also contaminated, defendant authorized plaintiff not to unload them in order to avoid the expense of reloading them as was done with the other eight cars. Defendant had no knowledge, and was not informed, that plaintiff had inspected the cars and had seen no evidence of contamination.
The contents of the cars rejected by plaintiff were thereafter sold by defendant to a salvage company for $17,887.87 on October 23, 1975. The proceeds of the sale are held by defendant but are admittedly owing to plaintiff unless, as contended by plaintiff, it is entitled to the full purchase price and expenses paid and incurred by it, together with interest.
The initial question is whether plaintiff made a prima facie case of liability under the Carmack Amendment. To recover thereunder, the evidence must sufficiently prove that at the time the bauxite ore *618 was delivered to defendant, it was in good, that is, an uncontaminated, condition and that it was in damaged, that is, a contaminated, condition when it was delivered to plaintiff. Once it has been established that the goods were in good condition when turned over to the carrier, the carrier can relieve itself of liability for damage to the goods only by showing not only that it was free from negligence but that the damage was caused by an act of God, the public enemy, the act of the shipper, public authority, or the inherent vice or nature of the goods. Missouri Pacific Railroad Company v. Elmore & Stahl, 1964, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194. However, the carrier has no such burden absent a finding that the goods were in good condition when they came into its custody and control.
To prove that the bauxite ore was uncontaminated when loaded on the Arrow Crane, plaintiff offered a certificate of analysis made in Guyana with an accompanying affidavit (in lieu of testimony) of the superintendent of the laboratory of Guyana Bauxite Company, Ltd. on the basis of which the analysis was admitted into evidence as a business record of the company. Nevertheless, we do not believe that the certificate sufficiently demonstrates that the 16,000 metric tons of bauxite actually loaded on the Arrow Crane on May 16, 1975 were free of contamination.
True, if a representative sample of a load is analyzed, that should suffice, prima facie, to show the condition of the entire load. However, there is no evidence, either in the affidavit, the certificate of analysis or elsewhere, as to the date, time or place at which the sample of ore was obtained and the analysis was made, or with respect to the circumstances and procedures involved in obtaining a representative sample and making the analysis. Of significance also is the fact that although the purported purpose of the certificate was to obtain customs clearance for the bauxite, it was not made until June 4, 1975, some 12 days after the vessel docked at Mobile, Alabama, and after the cargo had already been unloaded and delivered to the ultimate consignees. And inasmuch as no analysis of the bauxite was made in Mobile, Alabama, prior to unloading the vessel, the evidence leaves in a state of uncertainty the actual condition of the ore at the time it was placed in and removed from the hold of the ship.
Plaintiff urges that the printed statement on defendant's bill of lading acknowledging receipt of the bauxite "in apparent good order" of itself establishes a prima facie case of delivery of the bauxite to the defendant in an uncontaminated condition. Under the circumstances here present, we do not agree that this statement has the conclusive effect on the issue of contamination contended for by plaintiff. The cars were all fully loaded by personnel of Alabama State Docks with no participation by defendant's employees prior to the time the cars were delivered to defendant. They neither saw nor inspected what was placed in the cars. And, unquestionably, the railroad employees had no expertise in determining whether bauxite is contaminated. There is no evidence that such layman would know, absent an analysis of the material, whether it was contaminated, particularly since the shipper responsible for the loading had, in effect, vouched for the good condition of the material.
Although the matter is not free from doubt, we hold that the trier of the fact could find that plaintiff made a prima facie case on the basis of Malabud's testimony that he visually watched the unloading of the ship's cargo and observed no foreign materials in the bauxite, together with the testimony of the employees of the Alabama State Docks that the concrete pad and all equipment used in the unloading process had theretofore been thoroughly cleaned. In our judgment, however, the overwhelming weight of the evidence negatives the verity of this weak prima facie showing. We find that plaintiff has not established by the preponderance of the evidence that the bauxite ore in question was in an uncontaminated condition when delivered to defendant.
*619 We first consider plaintiff's claim as it relates to the one closed hopper car containing the bauxite contaminated with tripoli. Plaintiff's evidence is to the effect that this easily seen white contaminant constituted 20 per cent of the load. Malabud had carefully inspected this (as well as the other 49 cars) to be certain it was clean. It was his practice to reject any car containing even as much as one pound of a contaminant. He could not have failed to observe the tripoli had it been in the empty car.[6] Defendant had nothing to do with the loading process, so that it is evident that if the bauxite in this car was contaminated, that condition existed at the time the car came into the custody and control of defendant.
As for the eleven rejected open top hopper cars, we are also of the opinion that to the extent some of their loads may have been contaminated, defendant was not the responsible party. These eleven cars and two others had transported the bauxite which had been stored on the concrete pad. Not only was ground storing of bauxite unprecedented at the Port of Mobile, but the equipment used at the Docks in handling bauxite was also used in handling other materials, including iron ore. And iron ore, the red contaminant identified by plaintiff's witnesses, was in fact ground stored within 200 feet of the concrete pad. The Docks' personnel had no expertise (and expressed no opinion) concerning the condition of the bauxite.
Two of the thirteen cars were accepted by plaintiff. Only two of the remaining eleven cars had transported iron ore in their immediately preceding loads. In fact, two of the rejected cars had previously carried calcined bauxite ore. And although four cars had previously carried other materials, none of them could have been the red contaminant which plaintiff's employees allegedly observed during the process of unloading the cars at the plant. As we have held supra, we do not believe that Jackson testified truthfully that he saw red contaminant in all eight cars as they were being unloaded. The only other witnesses who testified that he observed any of the cars being unloaded was William Holtcamp. In his deposition, Holtcamp stated that he did not know how many cars he observed being unloaded other than that there were more than one. At the trial he recalled seeing three or four cars being unloaded, in each of which he saw a red foreign material.
The bauxite unloaded from all of the eight cars was all put in one pile separate from the other bauxite, so that it became impossible to determine whether the red contaminant was actually in all the cars. The remaining three cars were not unloaded. Yet, in spite of the fact that when visually inspected by plaintiff's employees no evidence of contamination had been noted, these cars were also rejected by plaintiff.
We have concluded that no more than three or four, at the most, of the eleven open top hopper cars rejected by plaintiff contained the red contaminant. Even so, we find from the weight of the evidence that whatever may have been the contamination in these or the other cars was existent prior to the time the bauxite was delivered to defendant. As we view the evidence, plaintiff must stand or fall on Malabud's testimony that he watched the ship's unloading process carefully enough to ascertain that all the bauxite being removed from the vessel was free of contaminants. We have noted supra that Malabud failed to note the presence of tripoli. It is equally likely that he failed to note the presence of other contaminants in the bauxite being removed from the bottom of the hold at the end of a very long day.[7]
It follows from the foregoing that plaintiff is entitled to judgment only for the salvage proceeds of the rejected bauxite, $17,887.87, together with interest.
This Memorandum Opinion constitutes our findings of fact and conclusions of law.
*620 The foregoing disposition of plaintiff's claim makes it unnecessary to rule defendant's contention that inasmuch as the rejected bauxite was not totally worthless, it was plaintiff's duty to accept the entire shipment and mitigate damages by undertaking to sell the ore at a price greater than its salvage value.
NOTES
[1] The tariff of the Alabama State Docks disclaims any liability for damage to cargo on its wharves, including damage caused by contamination.
[2] The record shows that Philipp's letter ordering the cars referred to a different vessel with a May 15 arrival date. Of more importance, the letter stated that the ship was carrying 13,000 metric tons of bauxite. Although defendant was orally notified that the name of the ship had been changed, defendant's computations as to the number of cars required had already been made on the basis of the tonnage originally specified. It would appear that the 3,000 increase in tonnage could well have had a bearing on the shortage in the number of cars defendant had on hand at the time the Arrow Crane docked.
[3] To put the matter in perspective: In addition to the 50 covered hopper cars loaded for plaintiff, defendant also initially furnished a number of other cars sufficient to transport the balance of approximately 11,500 tons of bauxite consigned to others than plaintiff. The decision as to which consignee would be required to wait until 13 additional cars became available was made by Malabud alone.
[4] The normal color of bauxite is very dark, almost black.
[5] In his deposition, Mr. Jackson testified that he observed the contaminant only in the first hopper of the first car which was unloaded and that he neither noticed nor paid attention to the other cars.
[6] There is no evidence that the car had previously carried tripoli.
[7] There is an indication in Malabud's testimony that he might have slept for a few hours during the unloading.