**KAISER ALUMINUM & CHEMICAL CORPORATION, Appellant,**

v.

**ILLINOIS CENTRAL GULF RAILROAD COMPANY, Appellee.**

No. 79–1311.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 9, 1979.

Decided Feb. 5, 1980.

Rehearing Denied March 5, 1980.

Jerome W. Seigfreid, Edwards, Seigfreid, Runge & Leonatti, Mexico, Mo., for appellant; Louis J. Leonatti, Mexico, Mo., on brief.

Daniel M. Dibble, Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, Mo., for appellee; Karen M. Iverson, Alphonso H. Voorhees, Greenfield, Davidson, Mandelstamm & Voorhees, St. Louis, Mo., on brief.

Before ROSS and STEPHENSON, Circuit Judges, and McMANUS, District Judge.*

ROSS, Circuit Judge.

Appellant, Kaiser Aluminum & Chemical Corporation (Kaiser), instituted this action under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 20(11), to recover the value of 12 carloads of bauxite allegedly contaminated while in the custody of Illinois Central Gulf Railroad Company (ICG). Originally filed in the Circuit Court of Audrain County, Missouri, the cause was removed to the United States District Court for the Eastern District of Missouri. The district court found that Kaiser failed to establish the delivery element of a prima facie case under the Carmack Amendment and accordingly denied Kaiser damages beyond the salvage value of the ore. We reverse and remand for further proceedings.

Calcined refractory grade bauxite is the primary component used by Kaiser in the manufacture of refractory brick. Kaiser purchased the bauxite ore which is the subject of this suit through Philipp Brothers, an agent of the Guyana Bauxite Company, Ltd. of Guyana, South America, for delivery f. o. b. railcars at Mobile, Alabama.

* The Honorable Edward J. McManus, Chief Judge, United States District Court for the Northern District of Iowa, sitting by designation.

By letter, Philipp Brothers notified ICG that the Bauxite, highly susceptible to contamination, would require clean, covered hopper cars, free of contaminants and suitable for transporting the ore. Although the letter referred to 13,000 metric tons of bauxite, the motor vessel Arrow Crane arrived at Mobile, Alabama on May 23, 1975, with 16,000 metric tons. Of this shipment, 4,272.158 metric tons were bound for Kaiser's plant at Mexico, Missouri, the balance being shipped to other refractory manufacturing companies.

The Alabama State Dock Authority, a public agency of the state of Alabama, wholly owned and operated the entire Mobile dock, storage area, equipment, and vehicles that were used in off-loading the motor vessel Arrow Crane and in loading the railcars and storing the ore. Both the dock personnel and Stanley Malabud, a representative of Philipp Brothers, testified that the area and the equipment used to load the railcars were clean, free of contaminants, and suitable for handling the bauxite. In addition, Malabud inspected the bauxite as the ship was unloaded.[1] He testified by deposition that the ore was uncontaminated. He also testified that he visually inspected all of the available railcars for contaminants, even though the railroad had been specifically requested to furnish clean cars on this occasion.

Fifty of the 63 railcars required to transport Kaiser's ore were available for immediate off-loading. These cars were loaded by the Alabama State Dock personnel, as was customary, and returned to the railroad on a designated joint interchange track approximately one mile from the actual loading site. Only one of these cars was rejected by Kaiser as contaminated with tripoli, a substance not found in Guyana.

After loading all available cars, Alabama dock personnel removed the remainder of the ore from the ship into dump trucks, deposited it for ground storage nearby on a concrete pad, and covered it with a plastic sheet. The dock employees, who were familiar with handling bauxite, meticulously cleaned the pad and equipment to accept this cargo.

Several days later, ICG informed Kaiser that the only cars then available were open top hoppers. Kaiser agreed to the use of the open hopper cars even though closed hopper cars are customarily used to transport bauxite. Consequently, the remainder of the ore was removed from the pad and shipped on May 31 and June 3, 1975, in 13 open hopper cars to Kaiser's plant at Mexico, Missouri.

Malabud neither inspected these cars nor supervised their loading. Of these cars, eight had visible contaminants. These cars were unloaded and the ore was placed in a segregated pile. By mutual agreement of the parties, three other cars which Kaiser suspected of having contaminants were not unloaded. Subsequent analysis by Kaiser indicated contamination to this bauxite by laminetic ore, vituminous coal, gibbsite, silicates, sulphates, iron ore and other oxides. These contaminants rendered the bauxite worthless to Kaiser.

## I. Standard of Review

From these facts the district court found that Kaiser failed to establish the requisite delivery element of a prima facie case of liability under the Carmack Amendment.[2] *Kaiser Aluminum & Chemical Corp.*

---

1. The Arrow Crane's previous contents were unknown but there was testimony to the effect that the ship had always carried bauxite. Calcined refractory grade [RASC] bauxite constituted the entire cargo of the Arrow Crane on this occasion.

2. The district court determined that although Kaiser may have made a prima facie showing on the delivery issue, Kaiser failed to sustain its burden of proof that the ore was in good condition when it was delivered to the railroad. It noted:

> Although the matter is not free from doubt, we hold that the trier of the fact could find that plaintiff made a prima facie case on the basis of Malabud's testimony that he visually watched the unloading of the ship's cargo and observed no foreign materials in the bauxite, together with the testimony of the employees of the Alabama State Docks that the concrete pad and all equipment used in the unloading process had theretofore been

*v. Illinois Central Gulf Railroad*, 468 F.Supp. 615, 618 (E.D.Mo.1979). This court is not at liberty to try a case *de novo* and must therefore give great deference to the factual findings of the district court. *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 183 (8th Cir. 1975). Such findings may not, however, be upheld where they are unsupported by substantial evidence or proceed from an erroneous conception of the applicable law. *Southern Illinois Stone Co. v. Universal Engineering*, 592 F.2d 446, 451 (8th Cir. 1979). After careful consideration of the entire record we are left "with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We are convinced that the district court's finding that Kaiser failed to establish delivery of the bauxite in good condition is clearly erroneous, and pursuant to Rule 52 of the Federal Rules of Civil Procedure, must be set aside.

## II. Burden of Proof Under the Carmack Amendment

▇ The Carmack Amendment to the Interstate Commerce Act,[3] 49 U.S.C. § 20(11), codifies the common law rule that a carrier, although not an absolute insurer, is liable "for the full actual loss, damage, or injury" to goods transported by it. How-

ever, there is no liability if the carrier can affirmatively demonstrate "that the damage was caused by '(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) the public authority; (e) or the inherent vice or nature of the goods.'" *Missouri Pacific Railroad v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964) (citations omitted). In an action to recover from a carrier for damage to a shipment, the consignee:

> establishes his prima facie case when he shows delivery [to the carrier] in good condition, arrival in damaged condition, and the amount of damages. Thereupon, the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability.

*Id.* at 138, 84 S.Ct. at 1145 (citations omitted). Accordingly, "the carrier bears a heavy burden of proof akin to res ipsa loquitur because it has peculiarly within its knowledge the facts which may relieve it of liability." *Fulton v. Chicago, Rock Island & Pacific Railroad*, 481 F.2d 326, 333 (8th Cir.), *cert. denied*, 414 U.S. 1040, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973).

ICG contends that Kaiser never established a prima facie case, so that it was never incumbent on the railroad to go forward with evidence rebutting Kaiser's pri-

thoroughly cleaned. In our judgment, however, the overwhelming weight of the evidence negatives the verity of this weak prima facie showing. We find that plaintiff has not established by the preponderance of the evidence that the bauxite ore in question was in an uncontaminated condition when delivered to defendant.

*Kaiser Aluminum & Chemical Corp. v. Illinois Central Gulf R.R.*, 468 F.Supp. 615, 618 (E.D. Mo.1979).

**3.** The Carmack Amendment, 49 U.S.C. § 20(11), provides in pertinent part:

Any common carrier * * * subject to the provisions of this chapter receiving property for transportation from * * * one State * * * to * * * another * * * shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company

to which such property may be delivered or over whose line * * * such property may pass * * * and no * * * limitation of any character whatsoever shall exempt such common carrier * * * from the liability imposed; and any such common carrier * * shall be liable * * * for the full actual loss, damage, or injury to such property caused by it or by any such common carrier * * * to which such property may be delivered * * * notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or * * tariff * * * and any such limitation * * is declared to be unlawful and void * * * [however] nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law * * *.

ma facie showing by proving that it was free from negligence *and* that the contamination resulted from an excepted cause.

Kaiser's contention that it established the element of delivery in good condition is premised on (1) a bill of lading, (2) an admission by the freight claims director of the railroad, (3) the absence of cleaning records as to the railcars, (4) precautions taken by dock employees, (5) the appearance of the bauxite on delivery to the carrier, and (6) initial tests of the bauxite embodied in a certificate of analysis. We will deal with these items of evidence, *seriatim*.

### III. The Bill of Lading

On May 4, 1975, the ICG executed a bill of lading acknowledging receipt of the bauxite "in apparent good order." ICG contends that the bill of lading is ineffective to establish the element of delivery in good condition. This court rejected a similar argument in *United States v. Mississippi Barge Line Co.*, 285 F.2d 381, 388–89 (8th Cir. 1960), holding that "A prima facie showing of delivery in good condition is

made through a bill of lading, executed by the carrier, containing a recital to that effect." (Citations omitted).[4] ICG has advanced no sufficient or logical reason for us to reject this rule of law.

ICG urges that the liability of a carrier for cargo does not commence until the goods are delivered to it and that delivery was not effected until after the ore was loaded in its cars and subsequent to the issuance of the bill of lading.[5] ICG insists that because the dock authority loads the ore, any contamination prior to delivery would not be discernible by railroad employees.[6] Further, it contends that only the shipper's agent is in a position and had the expertise to note defects in the ore.

This argument is specious. It does not excuse the ICG's own negligence in issuing the bill of lading acknowledging receipt of the ore in apparent good order with no noted exceptions. The railroad accepted the cargo in apparent good order and had ample opportunity to either inspect the goods or note that it was unable to as-

---

4. We agree with the majority of courts which have addressed this issue that acknowledgement by a bill of lading that a shipment is in "apparent" good order without limitation is prima facie evidence of delivery in good condition as to all parts open to inspection and visible. This does not preclude a carrier from showing that the alleged damage resulted from existing causes which were not apparent when the carrier received the goods. *Cutten v. Allied Van Lines, Inc.*, 514 F.2d 1196, 1198–99 (9th Cir. 1975); *Horn v. Cia de Navegacion Fruco*, 404 F.2d 422, 435 (5th Cir. 1968), *cert. denied*, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969); *Continental Grain Co. v. American Commercial Barge Line Co.*, 332 F.2d 26, 27 (7th Cir. 1964); *Tuschman v. Pennsylvania R.R.*, 230 F.2d 787, 791 (3d Cir. 1956). *Cf. Ed Miniat, Inc. v. Baltimore & Ohio R.R.*, 190 U.S.App.D.C. 380, 383, 587 F.2d 1277, 1280 (D.C.Cir. 1978) (recital of good order in bill of lading insufficient to establish condition of goods delivered under seal).

5. Our decision in *Republic Carloading and Distr. Co. v. Missouri Pacific R.R.*, 302 F.2d 381 (8th Cir. 1962), does not support ICG's contention that the bill of lading was issued before it assumed responsibility for the cargo. In *Republic Carloading*, the question was whether the railroad could be considered a common carrier and, as such, responsible for the loss or disappearance of shipments unloaded by the

railroad for delivery to a freight forwarder, lessee of depot space. By specific lease agreement, the parties had extended liability to the freight forwarder for shipments by interstate truck and rail carriers other than the Missouri Pacific Railroad. This court held that:

> In order that a railroad have the status and absolute liability of a common carrier with respect to a shipment, the shipper must have delivered the freight into its possession, the delivery must be for immediate transportation, and the shipper must give the carrier appropriate shipping instructions.

*Id.* at 385 (citations omitted).

No dispute exists in this case as to ICG's status as a common carrier subject to the provisions of the Carmack Amendment.

6. Bauxite is granular, ranges in color from gray to black, and is typically the size of gravel. Iron ore, one of the principal contaminants identified in 11 of the open hopper railcars, is black to red in color and marble size. That contaminant might have been difficult to detect to the untrained eye, but a white contaminant such as tripoli would have been readily visible whether in the ore before it was loaded into the railcars or in the empty railcars prior to loading.

certain their condition on delivery.[7] Despite ICG's contentions that there was ample time, potential and opportunity for contamination before the ore was delivered to the railroad, it failed to sustain its burden of proving that it was not negligent and introduced no evidence of precautions taken by the railroad to prevent contamination of the ore. Indeed, the dock employees' testimony that the ore was handled with care so as to prevent contamination and Malabud's testimony that the ore was uncontaminated when removed from the ship were uncontroverted.

## IV. Admission by a Party Opponent

██ L. B. Marzoni, Director of Freight Claims Services for ICG, admitted in a letter mailed to Kaiser on April 26, 1976, that "[i]t is highly likely that contamination originated with one or more railcars." That statement was one of several summing up the railroad's understanding of the evidence at the time, in a letter declining Kaiser's claim. The other items noted by Marzoni in this summation of the railroad's understanding of this case merely suggested ICG's uncertainty as to the scope of the railroad's duty to furnish clean cars in this situation. Apparently, the district court gave little weight to this admission. Indeed, it is not even mentioned in the court's opinion. Kaiser argues that this admission should have been accorded greater weight by the district court. We agree.

Rule 801(d)(2)(D) of the Federal Rules of Evidence provides that a statement is not hearsay if it is offered against a party and is "a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." The statements were made by Marzoni as an employee of the railroad, they concerned a matter within the scope of his agency or employ-

ment, and they were made during the existence of that relationship. This admission may be considered reliable under Rule 801(d)(2)(D), as an admission of a party opponent made by an agent, a freight claims director, concerning a matter within the scope of his employment. While we do not consider this admission by ICG's employee conclusive on the issue of the condition of the ore upon delivery to the railroad, we do believe that it strongly suggests that at some point, even ICG believed that the source of the contamination was in its railcars. In fact, the emphasis of Marzoni's letter on the limited scope of the railroad's duty to provide clean cars strongly supports this inference. Accordingly, the district court should have considered this admission in determining whether Kaiser established a prima facie showing of delivery in good condition. *See generally Mahlandt v. Wild Canid Survival & Research Center, Inc.*, 588 F.2d 626, 630–31 (8th Cir. 1978).

## V. Inspection of the Railcars

██ Although the ICG introduced testimony that its normal business practice was to inspect and clean its cars and to retain a record of this information, no such records were introduced into evidence. Kaiser contends that the nonoccurrence or nonexistence of any cleaning or inspection of these cars may be presumed under Rule 803(7) of the Federal Rules of Evidence. We agree. Rule 803(7) provides that evidence of the absence of an entry in records regularly kept is admissible as affirmative proof of the nonoccurrence or nonexistence of a matter normally recorded.

ICG urges that the lack of inspection and cleaning records was merely circumstantial evidence that had no bearing on the issue of whether Kaiser proved the ore was delivered to the railroad in an uncontaminated

7. Similarly, in *United States v. Mississippi Valley Barge*, 285 F.2d 381, 390–91 (8th Cir. 1960), a carrier urged that it be absolved of liability for cargo loaded by the shipper, claiming that the condition of the cargo was unknown to it

despite statements in its bill of lading to the effect that the cargo was in good order. The court rejected this argument, noting that the carrier's bill of lading was free of noted excep-

condition.[8] In this respect it contends that Philipp Brothers did not rely on the railroad to furnish cars suitable for transporting the bauxite and undertook to determine for itself whether the cars were suitable for that purpose. The railroad claims that through Malabud's inspection, Philipp Brothers substituted its judgment for ICG's in selecting cars suitable for loading the bauxite. ICG's reliance on *Minneapolis, St. Paul & Sault Ste. Marie Railroad v. Metal-Matic, Inc.*, 323 F.2d 903 (8th Cir. 1963) for the proposition that it was under no duty to inspect the railcars is misplaced. There we held that a delivering rail carrier's liability could not be premised on the shipper's reliance on an inspection of the shipment by the initial carrier's inspector. As was the case here for the first 50 closed hopper cars transporting ore to Kaiser, in *Metal-Matic* "[t]he evidence of responsible officers of the shipper was to the effect that they did not rely on any inspection made by the initial carrier." *Id.* at 907. In *Metal-Matic*, however, the carrier introduced evidence of the good condition of its cars and persuasively excluded any possibility of carrier negligence. No such evidence was adduced in the instant case to preclude a finding of negligence on the part of ICG. *See also Masonite Corp. v. Norfolk & Western Railway*, 601 F.2d 724, 728 (4th Cir. 1979).

■ ICG sought to introduce evidence that damage to the cargo resulted from an act of the shipper.[9] Stanley Malabud, an agent for Philipp Brothers inspected the closed hopper cars, equipment for loading, and the bauxite as it was being unloaded. Only one of these 50 closed cars inspected by Malabud was rejected by Kaiser. Tripoli, an easily seen white contaminant, consti-

tuted 20 to 30 percent of the load. The record indicates that the previous contents of that car were unknown. Thus, Malabud either failed to observe tripoli in the car or in the bauxite as it was being unloaded. Since only one of the 50 closed hopper cars transported to Kaiser was contaminated, and no other contamination claims were received from other consignees of this shipment of ore, we consider it highly unlikely that the ore itself was delivered to the railroad in a contaminated condition.

The district court inferred that Malabud necessarily missed contaminants in the bauxite in the ship's hold, since he missed the contaminant tripoli in the enclosed hopper car. The court stated that:

As we view the evidence, plaintiff must stand or fall on Malabud's testimony that he watched the ship's unloading process carefully enough to ascertain that all the bauxite being removed from the vessel was free of contaminants. We have noted supra that Malabud failed to note the presence of tripoli. It is equally likely that he failed to note the presence of other contaminants in the bauxite being removed from the bottom of the hold at the end of a very long day.

*Kaiser Aluminum & Chemical Corp. v. Illinois Central Gulf Railroad, supra*, 468 F.Supp. at 619. In support of its position, the district court noted that Malabud slept during part of the unloading process. Our reading of his deposition convinces us that Malabud observed the entire unloading of the ship. As a part of the cross-examination the following testimony was received:

Q. And when did you leave the vessel at what point in the unloading?

A. At night. I can't recall what time it was but just to get a few hours sleep.

---

tions and that it by its terms negatived the carrier's exception.

**8.** According to the railroad's records, the contents of the one closed hopper car that was rejected by Kaiser held prior contents that were unknown. This car was part of the first shipment.

**9.** Ordinarily, it is not the shipper's duty to select suitable cars, but the carrier is relieved from liability for failure to furnish such cars if

the shipper voluntarily selects cars under an express contract or in circumstances charging him with full knowledge of all defects and in reliance on his own, rather than the carrier's judgment. But the Carmack Amendment imposes on a carrier the burden of proving both its freedom from negligence and damage due to an excepted cause. There was no evidence presented here to the effect that the shipper knew or should have known that the cars were contaminated.

Q. The record, I think, indicates that the unloading was completed sometime around 1:00 or 1:30 A.M. With relation to that hour what time did you leave the vessel?

A. Not until after the vessel was finished.

Earlier, on direct, Malabud stated that he was present during the entire loading procedure. Malabud's failure to discover the one car contaminated by the tripoli, in the absence of any affirmative evidence showing that the railroad was not negligent, or any evidence other than pure conjecture on the part of the railroad as to the source of contamination, may not be accorded the weight given it by the district court. The railroad here has introduced virtually no evidence to establish that it was not negligent. *Cf. Masonite Corp. v. Norfolk & Western Railway, supra,* 601 F.2d at 728.

█ As for the last 13 open hopper cars delivering the bauxite which had been stored on the concrete pad which are the subject of this claim, the railroad clearly had a duty to deliver cars clean and suitable for the transportation of bauxite. Neither Kaiser nor representatives of Philipp Brothers inspected these cars. No cleaning records were introduced to establish the suitability of these cars. Moreover, no records were introduced to show inspection of the cars by the railroad. Under federal common law, shippers may ordinarily assume that railroads have inspected the cars they furnish. *Millers Mutual Insurance Association v. Southern Railway,* 483 F.2d 1044, 1047 (4th Cir. 1973).

In the absence of any affirmative showing by the railroad that it was in no way negligent, it may not be absolved of liability for the open hopper cars under the Carmack Amendment.

## VI. Deposition Testimony

█ The railroad hypothesized that the 11 rejected open hopper cars were contaminated[10] due to some negligence on the part of the dock employees. It surmised that the ore might have become contaminated while ground-stored within 200 feet of iron ore and that equipment used for the iron ore was the same as that used for the bauxite. Mere speculation, however, is insufficient to rebut the prima facie showing established by Kaiser of delivery in good condition. As the Supreme Court explained in *Missouri Pacific Railroad v. Elmore & Stahl, supra,* 377 U.S. at 143–44, 84 S.Ct. at 1148:

The general rule of carrier liability is based upon the sound premise that the carrier has peculiarly within its knowledge "[a]ll the facts and circumstances upon which [it] may rely to relieve [it] of [its] duty * * *. In consequence, the law casts upon [it] the burden of the loss which [it] cannot explain, or explaining, bring within the exceptional case in which [it] is relieved from liability."

(Citation omitted.) No direct evidence was submitted by the railroad to contradict the evidence establishing the great care taken by the dock employees in loading and storing the ore, and, in handling and cleaning their equipment. Their deposition testimony supports the inference that the ore was uncontaminated when delivered to the railroad. It also negates any inference that the ore was contaminated during the loading procedure.

## VII. Certificate of Analysis

█ Finally, Kaiser introduced a certificate of analysis revealing no contaminants in a representative sample of the ore obtained prior to its shipment from Guyana. The district court admitted the certificate of analysis as a business record under Rule 803(6) of the Federal Rules of Evidence, but

---

10. The evidence was inconclusive as to whether all of the ore in these cars arrived in damaged condition. *Kaiser Aluminum & Chemical Corp. v. Illinois Central Gulf R.R., supra,* 468 F.Supp. at 619. ICG acquiesced in Kaiser's representation that it suspected contaminants in the last three cars and requested that the ore remain unloaded. The district court found that as many as four of the open top hopper cars were contaminated in addition to the closed hopper car containing tripoli. We assume, therefore, for the purpose of this appeal, that at least seven of the open top hopper cars were contaminated.

found it unpersuasive on the issue of delivery in good condition, reasoning that:

> [T]here is no evidence, either in the affidavit, the certificate of analysis or elsewhere, as to the date, time or place at which the sample of ore was obtained and the analysis was made, or with respect to the circumstances and procedures involved in obtaining a representative sample and making the analysis.

*Kaiser Aluminum & Chemical Corp. v. Illinois Central Gulf Railroad, supra,* 468 F.Supp. at 618. We cannot say that the district court clearly erred in declining to accord the certificate much probative value on the issue of the actual condition of the ore at the time it was removed from the ship's hold. *See, e. g., Aunt Mid, Inc. v. Fjell-Oranje Lines,* 458 F.2d 712, 719 (7th Cir. 1972).

*VIII. Conclusion*

■ We have considered the other arguments of the parties and we find them to be without merit. We believe that the cumulative effect of the bill of lading acknowledging receipt in good order, the admission by ICG's freight claims director, the absence of any cleaning records for the cars in question, and the uncontroverted testimony of Malabud and the dock employees sufficed to establish the element of delivery in good condition under the Carmack Amendment. Indeed, under the circumstances, we fail to see what further evidence could have been submitted by Kaiser to establish delivery of the ore in an uncontaminated condition. As the Supreme Court stated in *Missouri Pacific Railroad v. Elmore & Stahl, supra,* 377 U.S. at 144, 84 S.Ct. at 1148:

> We are not persuaded that the carrier lacks adequate means to inform itself of the condition of goods at the time it receives them from the shipper, and it cannot be doubted that while the carrier has possession, it is the only one in a position to acquire the knowledge of what actually damaged a shipment entrusted to its care.

The district court concluded that Kaiser established the second element of arrival of the ore in a damaged condition. It is clear from the district court's award of damages in the amount of the salvage value of the ore that the third element of a prima facie case under the Carmack Amendment has also been established. In the absence of any rebuttal evidence establishing ICG's freedom from negligence and that the source of contamination was due to an excepted cause, we conclude that the liability of the railroad has been established under the Carmack Amendment.

On remand, the district court should determine the damages owed Kaiser under the principles enunciated by this court in *Chicago and North Western Railroad v. Union Packing Co.,* 514 F.2d 30, 35 (8th Cir. 1975) and *Fraser-Smith Co. v. Chicago, Rock Island & Pacific Railroad,* 435 F.2d 1396, 1399 (8th Cir. 1971). If it is found on remand that ICG in fact agreed mutually with Kaiser not to unload three of the open hopper cars to treat them as being contaminated, ICG should be estopped from claiming that these railcars were not contaminated.

The judgment of the district court is reversed and the cause remanded for a determination of damages.