**ED MINIAT, INC.**

v.

**BALTIMORE AND OHIO RAILROAD COMPANY, Appellant.**

**No. 77–1671.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 9, 1978.

Decided Oct. 5, 1978.

As Amended Dec. 6, 1978.

---

Laidler B. Mackall, Washington, D. C., with whom William C. Kelly, Jr., Washington, D. C., was on the brief, for appellant.

Eugene D. Anderson, Washington, D. C., for appellee.

Before LEVENTHAL and MacKINNON, Circuit Judges, and JAMESON,* United States Senior District Judge for the District of Montana.

Opinion for the court filed by MacKINNON, Circuit Judge.

MacKINNON, Circuit Judge:

This appeal involves an action for damage to freight resulting from the partial spoilage of meat carried under refrigeration by appellant, Baltimore and Ohio Railroad Company (B & O) from Chicago to Washington. There is no question that the meat arrived in damaged condition—although the railroad disputes the extent of this damage. The basic issue before this court is whether or not the appellee shipper, Ed Miniat, Inc. (Miniat), bore its burden of proving at trial that the meat, which was delivered under seal to the railroad for shipment, had been tendered to the carrier in good condition sufficiently to have established a prima fa-

cie case for B & O's liability under section 20(11) of the Interstate Commerce Act, 49 U.S.C. § 20(11) (1970)[1] and the leading case of *Missouri Pacific Railroad Co. v. Elmore & Stahl*, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964). We conclude that the appellee did not satisfy his burden of proof, and accordingly reverse the judgment rendered by the trial court sitting without a jury.

On Friday, August 29, 1975, Miniat delivered two refrigerated truck trailers, which it had loaded with beef forequarters, to the B & O freight depot in Chicago for "piggyback" transportation to Washington. The shipment moved under "straight bills of lading" which stated that the goods were received in "apparent good order"[2] and were marked for arrival in Washington on Tuesday, September 2nd. The trailers, travelling over the Labor Day (September 1st) weekend, in fact did not arrive until the night of September 5th. Moreover, as September 5th was a Friday and the consignee's Giant Foods (Giant) meat packing facilities were closed for the weekend,[3] the meat was not actually tendered to Giant until September 8th, nearly one week after the anticipated delivery date marked on the bills of lading.[4] Upon being tendered, the goods were rejected without inspection by

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 49 U.S.C. § 20(11) provides, in pertinent part:
   Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving *property for transportation* from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia . . . shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass . . . . .

2. J.A. 249, 250. There had been some debate concerning the evidentiary effect of a bill of lading which recites that the goods received are "in apparent good order" when the goods themselves are not open for inspection. Annot., Carrier's Issuance of Bill of Lading or Shipping Receipt, Without Notation Thereon of Visible Damage or Defects in Shipment, as Cre-

ating Presumption or Prima Facie Case of Good Condition When Received, 33 ALR 2d 867, § 3 p. 872 (1954). We agree with the weight of authority that such a statement in the bill of lading is insufficient to establish delivery in good condition under § 20(11), see, e. g., *Hoover Motor Express Co. v. United States*, 262 F.2d 832 (6th Cir. 1939); *Glass-Tite Industries v. Spector Freight Systems*, 102 R.I. 301, 230 A.2d 254, 259 (1967); *Lincoln Farm Products Corp. v. Central Railroad Co.*, 81 N.J.Super. 161, 195 A.2d 200 (1963); *World-Wide Meats, Inc. v. Chicago & N. W. Transportation Co.*, 383 F.Supp. 807 (N.D.Iowa 1974).

3. Appellant's Brief at 5.

4. The bills of lading were marked for arrival on September 2, 1975. J.A. 249, 250. Pursuant to the condition of § 2(a) of the Uniform Domestic Straight Bill of Lading, however, B & O was under no obligation to deliver the meat on any specific date, but rather only to transport it "with reasonable dispatch." Appellant's Brief at 12.

the consignee "account delay."[5] B & O thereupon ordered the Railroad Perishable Inspection Agency, an independent agency established to investigate spoilage of goods transported by rail, to conduct an inspection of the contents of the trailers.[6] The agency reported that both trailer loads of Miniat meat were in off-condition; that the beef gave off an odor from slight to strong; that the cut surfaces of the meat and the fat were discolored; and that surface mold was evident on the rib eyes of the meat in one of the trailers.[7] B & O notified Miniat of the consignee's rejection of the shipment,[8] and appellee responded by stating that it abandoned the shipment, requested B & O to sell the beef for salvage, and informed the railroad that it would subsequently submit a damage claim.[9] B & O refused to attempt to find a purchaser for the meat,[10] and Miniat, after inquiring of the company from which the beef had originally been shipped to Chicago,[11] if they knew of a firm which might purchase such a quantity of beef in off-condition, sold the shipment sight unseen to a party in New Jersey for approximately 65% of the original contract price with Giant.[12] B & O rejected Miniat's claims for the $15,185.28 difference between the salvage and contract price on the grounds that "the transportation record indicates that the trailer[s] moved in accordance with schedules and [that] the intransit temperatures were within the tolerance of requested service."[13] Thereupon, Miniat brought this suit.

## I

■ It is well settled, and both parties agree,[14] that in order to prevail under section 20(11), the plaintiff must establish a prima facie case consisting of three elements: (1) delivery to the carrier in good condition; (2) arrival in damaged condition, and (3) the amount of damages, *Missouri Pacific Railroad Co. v. Elmore & Stahl, supra; Chesapeake & Ohio Ry. v. Thompson Mfg. Co.,* 270 U.S. 416, 46 S.Ct. 318, 70 L.Ed. 659 (1926); *Harris Truck Lines, Inc. v. Cherry Meat Packers, Inc.,* 313 F.2d 864 (7th Cir. 1963).

■ Appellant's chief argument on appeal is that there was no competent evidence presented to the trial court to establish that the meat in question was in fact delivered to B & O in good condition. When goods travelling under seal are delivered to the consignee in imperfect condition, the shipper must submit proof of delivery in good condition other than the mere recital on the bill of lading in order to establish a prima facie case under section 20(11), *Blue Bird Food Products Co. v. Baltimore & Ohio Railroad Co.,* 492 F.2d 1329 (3d Cir. 1974); *World-Wide Meats, Inc. v. Chicago & N. W. Transportation Co.,* 383 F.Supp. 807 (N.D.Iowa 1974).[15] The issue before us thus resolves into determining whether there was presented adequate additional evidence of the condition of Miniat's meat when delivered to B & O to satisfy the requirement of *Elmore & Stahl.*

■ Appellee is able to produce only two facts besides the declarations on the bill of lading, which tend to establish the good condition of its beef when delivered to B &

---

5. J.A. 254.

6. J.A. 92–93, 110.

7. J.A. 247, 248. One trailer was in considerably worse condition than the other, with surface mold visible and approximately one-third of the meat on the floor of the trailer rather than on the meat hooks. Compare J.A. 137, 184, 247 and 248.

8. J.A. 254.

9. J.A. 50.

10. J.A. 88, 105.

11. J.A. 88–89. The slaughterhouse involved was one of the largest abattoirs in the world.

12. J.A. 86, 89, 243 and 244. The contract price of the meat had been $43,657.68, the salvage value was $28,472.30.

13. J.A. 255, 256.

14. Appellee's brief at 10–11; Appellant's Brief at 5.

15. *See* note 2 *supra.*

O: (1) Miniat's record of the incoming meat received at its plant on the day the shipment in question was processed, and (2) the presence of a USDA inspector on Miniat's premises. Upon careful examination of the record, we find that the probative value of this evidence is so slight as to be virtually negligible, and are convinced that to allow such "proof" to remove this case from the rationale of *Blue Bird Food Products Co. v. Baltimore & Ohio Railroad Co., supra,* would be to distort the holding of that opinion beyond recognition.

The arrival reports which Miniat presented as evidence of the good condition of the meat, when Miniat received it, are inconclusive, even if they could be definitely linked to the meat actually shipped to Giant. The temperatures recorded on such reports were consistent with beef in good condition,[16] but temperature alone is not direct proof and does not necessarily indicate the true condition of meat. Spoiled beef might simply have been cooled to the appropriate temperature shortly before delivery; the arrival report gives no indication at all, such as a description of the appearance of the meat, that it was examined and found to be in good condition.[17] There is also the possibility that the beef, even if it arrived in top condition, might have deteriorated during the time that it was being processed in the Miniat warehouse. *Cf. S. Strock & Co. v. Southern Pacific Co.,* 326 F.Supp. 695 (D.Mass.1971).

## II

The most crippling inadequacy of the arrival records as evidence of the condition of the meat when delivered to B & O, however, is not the inconclusiveness of the information they contain, but the fact that the records deal only with three of eight shipments of meat received by Miniat on the day it made up the order for Giant, and one of these three reports was so illegible that the appellee eventually decided not even to offer it as evidence.[18] Thus, only 25 per cent of the meat which Miniat might have packed into the B & O trailers was covered by the arrival reports. Appellee's own witness admitted that it was impossible to be sure that any of the meat shipped on B & O came from the three shipments for which reports were extant.[19] Indeed, he was not even able to tell from which of the eight loads received by Miniat on August 29th the shipment to Giant had been constituted, let alone whether the reports themselves covered any of the meat in question.[20] The most that appellee could claim was that the meat shipped on B & O "may have" come from the meat whose arrival was recorded as having been at a temperature consistent with unspoiled condition.[21] This is insufficient proof of "delivery in good condition" to establish a prima facie case under *Elmore & Stahl*—to hold otherwise would be to subject carriers to liability on the basis of no more than a mere possibility that they were responsible for damage to shipments.[22]

16. J.A. 240–242; appellant does not contest the fact that the temperatures recorded on Miniat's arrival reports are consistent with beef in good condition, Appellant's Brief at 8.

17. The arrival reports consist of nothing more than a listing of the beef, its place of origin, the date, and the temperature of the meat when delivered. J.A. 240–242.

18. J.A. 62.

19. J.A. 77. There had originally been arrival reports for all shipments received by Miniat, but these were for the most part destroyed pursuant to company policy of disposing of these reports after a year. As the reports were destroyed two months after this litigation was begun, appellee's witness conceded that their destruction was improper, but insists that it

was also inadvertent. J.A. 74. This nevertheless casts a dark cloud over the claim.

20. J.A. 79.

21. *Id.*

22. The mere possibility that the carrier was liable is not sufficient to support recovery under § 20(11). *See, e. g., Glass-Tite Industries v. Spector Freight Systems, supra* note 2, 230 A.2d at 258; *Valco Mfg. Co. v. C. Rickard & Sons, Inc.,* 22 N.J.Super. 578, 580, 92 A.2d 501, 503 (1952) ("The law does not permit speculation or conjecture on this subject. The right of [defendant] to have [plaintiff] establish the elements which form the basis of liability is a fundamental one.")

It appears that Miniat itself concedes that its arrival reports were inconclusive. Their position at the hearing seems to have been that these reports, when considered *together* with the fact that there was a USDA meat inspector at Miniat, provided sufficient proof of the meat's condition when it left appellee's plant to establish a prima facie case under 20(11).[23] The logic of this assertion is imperfect. Moreover, the evidence presented relating to the presence of a USDA inspector is as inconclusive as the arrival reports, and does little to advance Miniat's case.

██ Although there was testimony that there was a full-time inspector at Miniat, it also appeared that the same inspector might have had responsibility for checking on several other plants in the same area,[24] thus reducing the likelihood that he in fact examined the particular shipment of meat consigned to Giant. Most importantly, no one was able to testify that the inspector actually examined any of the meat eventually shipped to Washington. Miniat's argument thus reduces to the contention that since there was a USDA inspector on the premises for at least part of the day, and it should be presumed that he would not let substandard meat out of the plant, the meat delivered to B & O under seal can be presumed to have been in good condition. The "presumption of law that all public officers perform their duties until the contrary is proven"[25] on which appellee relies in arguing that the evidence of the mere presence of the USDA inspector should establish the good condition of the meat is, however, too thin a reed to support an inference of delivery in good condition under section 20(11). Under section 20(11), the burden of establishing the condition of

the beef when entrusted to the railroad clearly lies on the shipper, e. g., *Uneeda Home Appliances, Inc. v. Long Island Railroad Co.,* 49 Misc.2d 953, 268 N.Y.S.2d 731 (1966), and discharging this burden requires some direct evidence of this condition. The sometime presence of an inspector on the premises cannot substitute for an indication that there actually was an inspection. Miniat argues that the burden shall be on B & O to prove that the inspector failed to perform his job properly.[26] However, it is the *shipper* (Miniat) that has the burden of establishing a prima facie case of the railroad's liability.

In *Ace Freight Forwarding Co. v. Baltimore & Ohio Railroad Co.,* 202 A.2d 649, 651 (D.C.App.1964), the court held that the shipper had failed to produce competent evidence of the condition of the goods delivered to the carrier when "no witnesses were produced who had actual knowledge, through personal inspection and examination of the condition of the household goods at the time of their receipt by the carrier." Here neither the inspector himself nor any such witnesses were produced by appellee. (No certificate of inspection certifying the condition of the meat was introduced by Miniat.)[27] Without indicating any reflection on the efficiency and expertise of USDA inspection, it would be patently unfair under the circumstances presented in this case to hold that the mere fact that an inspector was assigned to Miniat was sufficient to establish the good condition of perishables which the railroad itself had no opportunity to inspect. There are any number of reasons that an inspector might not examine a given shipment of beef. To hold that the assignment and possible presence of a USDA agent can alone establish the

---

23. J.A. 77.

24. J.A. 201–202. Even without having divided responsibilities, there was testimony that the inspector was unlikely actually to see all the meat leaving a plant. J.A. 169.

25. Appellee's Brief at 12 n. 26.

26. *Id.*

27. It was not apparently the practice of the USDA inspector to give inspection certificates to meat outgoing from Miniat, so that the absence of one in this case does not raise any negative inferences against the appellee; however, it also does not offer any corroboration of his assertion that the meat was in good condition when delivered to B & O. *See, e. g., S. Strock & Co. v. Southern Pacific Co.,* 326 F.Supp. 695 (D.Mass.1971).

condition of all the meat processed by a plant would be virtually to reverse the clear mandate of section 20(11) that the shipper must establish a prima facie case involving, *inter alia,* proof of the satisfactory condition of his goods when delivered for shipment. Failing such proof the railroad need not come forward with any evidence rebutting charges of causing the freight loss.

Had the USDA agent himself been able to testify that he inspected the specific shipment in question, or more generally that he examined all meat leaving the Miniat plant on August 29th; or had there been some written records of any such inspection, appellee would be on much firmer ground in asserting the significance of the presence of this agent. However, with no evidence whatsoever to establish that the meat in question was indeed examined, while appellant certainly has not proven dereliction of duty by the inspector, neither has appellee proven the condition of the goods it delivered to the carrier. As stated above, section 20(11) required the shipper to make an affirmative showing of the condition of his goods when shipped, *e. g., Uneeda Home Appliances, Inc. v. Long Island Railroad Co., supra.* Miniat simply has not met this initial burden.

### III

■ This would be a far different case had the meat been delivered to B & O without a seal, so that the railroad might itself have examined the shipment to ensure that it was unspoiled when delivered for shipping. Although a seal does not absolutely prohibit the shipper from inspecting the goods delivered to it, there was testimony, and there can be no serious question, that it is the custom and practice of carriers not to break the seal of merchandise delivered to them.[28] The seal is placed on shipments for the convenience of the shipper. It is a method of giving the consignee some guarantee that his goods have not been tampered with during shipment.[29] If a shipper chooses to avail himself of the benefits of a seal, it is eminently fair, if he is to prevail on a claim for in transit damage to that shipment, that he supply the court with persuasive proof, not merely evidence of the possibility, that the goods shipped were in good condition when entrusted to the carrier.[30] With the advantage of the seal, the shipper must bear the burden of proving the condition of his goods. Any other analysis would leave carriers open to unfounded claims by fraudulent shippers abusing the use of the seal. It would also distort the effect of section 20(11) and make the carrier presumptively liable whenever goods under seal are in imperfect condition when received by the consignee. Section 20(11) establishes a rebuttable presumption of carriers' negligence, *e. g., United States v. Central of Georgia Ry. Co.,* 411 F.Supp. 1023 (E.D. Tenn.1976); *Winn-Dixie Montgomery, Inc. v. Brinks, Inc.,* 298 F.Supp. 366 (M.D.Ala. 1968), and the potential harshness of this presumption can only be justified if the shipper can produce direct proof of his prima facie case.

[T]he seal serves as a type of security device providing the shipper's assurance to the consignee that the load has not been tampered with from the time it left the shipper's premises. The practice of carriers to break the seal in case of an emergency, when requested by the shipper, or when there is a history of recurring loss with the shipper, does not, in the absence of specific shipper's instructions, impose upon the carrier the duty to also break the seal for purposes of inspecting the contents of the trailer.

---

**28.** J.A. 121.

**29.** *E. g., Blue Bird Food Products Co. v. Baltimore & Ohio Railroad Co.,* 492 F.2d 1329, 1333 (3d Cir. 1974).

**30.** *See* note 21 *supra.* The probative value of a statement on the bill of lading that the goods are in "apparent good order" is much greater when the goods are open for the inspection of the carrier than when they are shipped under seal. *See* Annot., Carrier's Issuance of Bill of Lading or Shipping Receipt, Without Notation Thereon of Visible Damage or Defects in Shipment as Creating Presumption or Prima Facie Case of Good Condition When Received, *supra* note 2, 33 A.L.R.2d at 872 (citing cases).

*Blue Bird Food Products Co. v. Baltimore & Ohio Railroad Co., supra,* 492 F.2d at 1333. Given such an absence of duty on the part of the carrier, and the fact that it is the shipper who decides, for his own benefit, whether or not to seal his shipment, if the law is to assess liability against the carrier for goods which arrive at their destination in a condition which is allegedly different from their condition at the time of shipment, then the onus must be on the shipper to establish that the goods protected by his seal were in fact in such condition. That was the clear intent of Congress. Miniat's beef may well have been in excellent condition when delivered to B & O, but appellee has failed to discharge the burden of proving that fact.

## IV

Although we dispose of this appeal on the grounds that appellee has not made out a prima facie case, it is worth noting that the railroad was able to present reasonably persuasive evidence that it did not cause the damage incurred by the Miniat shipment. The temperature records for the trailers in which the meat was shipped indicated that the refrigeration units had maintained temperatures sufficiently low to ensure the continued good condition of the meat.[31] On September 4th and September 5th, the temperatures in the cars were not recorded, but the temperature in both trailers was identical on September 3rd and on September 6th. This is some evidence that the refrigeration units had functioned properly throughout the prolonged journey.[32]

Expert testimony also established that properly refrigerated meat—as appellee's apparently was during its sojourn on the B & O—can last without spoilage for a period appreciably longer than the time the shipment in question was in the railroad's

hands.[33] Thus, even if B & O was responsible for undue delay in delivering the meat, that would not make it accountable for any deterioration in its quality. This being the case, while perhaps B & O might have caused some loss to Miniat by delivering the goods so late that Giant rejected them on "account delay," there is no indication that Miniat could not have found another purchaser at substantially the same price as that offered by Giant. The apparent likelihood that the carrier in this case was not responsible for the deterioration of the goods shipped—for which loss he would be liable if appellee's interpretation of section 20(11) were to prevail—underscores the importance of requiring the shipper to present some direct proof of the condition of goods shipped under seal, lest the carrier be charged for damage he did not cause.

## V

Appellant raises other points in his brief concerning the amount of damages awarded,[34] the hearsay nature of the evidence that the meat was delivered in off-condition[35] and the competency of the evidence that there was an improper delay in the delivery of the beef.[36] Due to our determination that the appellee did not adequately establish that the meat was delivered in good condition, we find it unnecessary to reach any of these issues. We hold here only that where goods are delivered under seal to a carrier and there is no direct evidence of their delivery in good condition other than a bill of lading reciting that they are "in apparent good order," the presence of a USDA inspector in the plant of origin and incomplete records of the condition of the goods upon arrival at the shipper's plant, are not sufficient to constitute a prima facie case for recovery by the shipper under 49 U.S.C. § 20(11).

*Judgment accordingly.*

---

31. J.A. 141, 148.

32. J.A. 149.

33. J.A. 148, 195.

34. Appellant's Brief at 13–16. Appellant presented considerable testimony by a Dr. Clarence H. Pals, a veterinarian, that meat in the

condition the Miniat's was reported to be in upon arrival in Washington was still worth 90% of its original value. J.A. 153–154.

35. Appellant's Brief at 10–12.

36. *Id.* at 12–13.