BROCKWAY–SMITH COMPANY, Kemper Insurance Company, and Fireman's Fund American Insurance Company, Plaintiffs,

v.

BOSTON AND MAINE CORPORATION and Chicago–Milwaukee St. Paul & Pacific Railroad, Defendants.

Civ. A. No. 74–5660–M.

United States District Court, D. Massachusetts.

July 23, 1980.

George A. Sanker, Boston, Mass., for plaintiffs.

Richard J. Ferriter, James B. Winward, Boston, Mass., for defendants.

OPINION

WALTER E. HOFFMAN, Senior District Judge, Sitting by Designation.

This action involving interstate freight damage was filed by Brockway–Smith Company (Brockway) on December 11, 1974, under the provisions of the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 20(11), naming as defendants Boston and Maine Corporation (B & M), the destination carrier, and Chicago–Milwaukee St. Paul & Pacific Railroad (C–M), the carrier that issued the bill of lading. On March 13, 1979, the court ordered that Kemper Insurance Company and Fireman's Fund American Insurance Company, the insurers of the loss, be added as real parties in interest. By agreement of the parties, on April 25, 1979, the complaint was dismissed with prejudice as to defendant C–M. The case was tried before this court without a jury on May 31, 1979.

The facts are as follows: In June, 1974, Brockway purchased from Andersen Corporation (a firm located in Bayport, Minnesota) a quantity of frames, windows, doors and other related items at a net invoice price of $25,436.56. Andersen delivered the shipment to C–M on July 26, 1974, at which time C–M issued a bill of lading naming Andersen as consignor, the Area Millwork Company[1] in Portsmouth, New Hampshire as consignee, and Brockway as stop–off consignee for partial unloading at Lowell Junction, Massachusetts.

The railroad car containing the shipment was received by B & M from a connecting railroad at Mechanicsville, New York, on August 4, 1974. On August 6th at approximately 10:15 a. m., B & M notified Brockway that the shipment had arrived at B & M's yard in Lowell Junction.

Sometime during the afternoon of August 6th, B & M spotted the car containing the shipment at Brockway's private sidetrack in Andover. The sidetrack leads from B & M's line to Brockway's plant (a dis-

1. Area Millwork Company, a customer of Brockway, was to receive a portion of the ship-

ment amounting to $11,756.19 on the invoice.

tance of approximately one–fourth of a mile). B & M placed the car just far enough down Brockway's siding to be clear of the B & M line. In this position, the car was completely out of sight of Brockway's plant. B & M did *not* notify Brockway that it had placed the car on Brockway's sidetrack.

At approximately 6:30 p. m. on August 6th, the car was involved in a fire and the shipment was damaged. Salvage proceeds amounted to $1823.39.

■ The determinative issue in this case is whether B & M completed delivery of the shipment prior to the fire. The Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 20(11), provides that any "common carrier, railroad, or transportation company . . . receiving property for transportation from a point in one State . . . to a point in another State . . . shall be liable . . . to any party entitled to recover thereon . . . for the full actual loss, damage, or injury to such property caused by it . . . ." A plaintiff owner or consignee can establish a prima facie case by showing that the carrier received the shipment in good condition, that the goods were delivered in damaged condition, and the extent of the damage. *Missouri Pacific Railroad Co. v. Elmore & Stahl*, 377 U.S. 134, 138, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964). If placing the car containing the shipment on Brockway's sidetrack did not constitute delivery of the goods to Brockway, then the goods were still in transit and B & M was responsible for the shipment at the time of the fire.

■ A carrier may effect the delivery of a carload of goods by placing the car on the consignee's sidetrack if that is the intention and understanding of the parties or the established custom and usage. 13 Am. Jur.2d, *Carriers*, § 411 (1964). However, if the carrier fails to give a required notice to the consignee, or if for some other reason the delivery is regarded as incomplete, such placement will not constitute a delivery. *Id.* In Brockway and B & M's case delivery was not defined in any written agreement.[2] Therefore, the established custom and usage must be considered.

■ The evidence presented at trial established the following pattern. When a car consigned to Brockway arrived at B & M's yard in Lowell Junction, B & M would notify Brockway that the car was available for delivery. Shortly thereafter, often on the same day, B & M would carry the car to Brockway's sidetrack at Andover and place the car on the sidetrack so that it was just clear of the main track. B & M's obligations would not end at this point because it still had to carry the car the length of the sidetrack to Brockway's plant–a distance of approximately one–fourth of a mile.[3] Brockway had no equipment or means by which it could bring the car from the switch to the plant and relied solely on B & M to accomplish this task.[4] Unloading always took place at the plant.

Occasionally, a car would be left near the switch without being immediately pushed to the plant. This was usually a result of the need of B & M to clear the main track so that other traffic could pass and not having the time to push the car all the way to the plant. On nearly all of these occasions the car would be moved to the plant later that same day. Over the years, however, there were several instances in which a car was left at the switch overnight.

2. On October 7, 1969, Brockway and B & M entered into a written sidetrack agreement wherein B & M agreed to switch cars to and from Brockway's sidetrack at Brockway's request. The agreement had no provision concerning delivery or notice of delivery. The bill of lading provided only that B & M was to "carry to its usual place of delivery . . . ."

3. B & M would push the car up to Brockway's plant where, if there was room, the car would be placed inside the building adjacent to the unloading platform. If there was no room inside the building, the car would be pushed as close to the building as possible. There were no occasions in which a car could not be placed close enough to the building to be within sight of plant employees.

4. B & M assessed no extra charge for this service; rather, it was included in the original transit charge.

Brockway never acquiesced in this practice because, due to a curvature in the sidetrack, the location was out of sight of the plant and plant security personnel. On more than one occasion Brockway verbally instructed B & M to refrain from leaving cars on the sidetrack without pushing them to the plant.

On the date of the fire Brockway's plant at Andover was suffering from a Teamsters' strike. Because of the reluctance of railroad union employees to cross the Teamsters' picket line, the transfer of cars from the switch to the plant was to be handled by B & M supervising personnel. On August 5th, the day before the shipment was damaged by fire, Brockway was informed by B & M that the switch of the car containing the shipment would not be made until August 8th due to the lack of available supervising personnel. Thus, Brockway was not looking for the shipment until August 8th. Moreover, when the switch was made on August 6th, no notice of that fact was given to Brockway. Brockway had no way of knowing that the switch had been made.

An examination of the established custom and usage in addition to the facts surrounding this particular shipment make it clear that B & M did not complete delivery of the shipment prior to the August 6th fire. B & M's responsibility did not end at the derailing switch. Final delivery could not be made until B & M moved the car up the sidetrack to Brockway's plant. "The mere arrival of goods at their destination does not reduce the liability of the carrier . . . where anything remains to be done by the carrier in order to effectuate a delivery. The owner is entitled to a reasonable opportunity to take or receive his property from the possession of the carrier after the transit is terminated." *Keystone Motor Freight Lines v. Brannon–Signaigo Cigar Co.*, 115 F.2d 736, 738 (5th Cir. 1940); *see also Erie Railroad Co. v. Shuart*, 250 U.S. 465, 39 S.Ct. 519, 63 L.Ed. 1088 (1919). Leaving

the car at the switch out of sight of the plant and without notifying Brockway presented no reasonable opportunity for Brockway to take possession of the shipment. For this reason the shipment was still in transit at the time of the fire.

■ When an owner can prove that goods delivered to the carrier in good condition were damaged while in the carrier's possession, a presumption arises that the damage was due to the negligence of the carrier. Thus, in order to prevail under 49 U.S.C. § 20(11), a plaintiff–owner must establish a prima facie case consisting of the following elements: delivery to the carrier in good condition, arrival in damaged condition, and the amount of damages. *Missouri Pacific Railroad Co. v. Elmore & Stahl, supra*, 377 U.S. at 138, 84 S.Ct. at 1144. Brockway has shown that the shipment was damaged while in B & M's possession. This satisfies the requirement of showing that the goods arrived in damaged condition. B & M contends, however, that Brockway has failed to demonstrate that the shipment was delivered to the carrier in an undamaged condition.

■ A bill of lading acts as both a receipt for property delivered to a carrier and the basic document of carriage. *Michigan Central Railroad Co. v. Mark Owen and Co.*, 256 U.S. 427, 41 S.Ct. 554, 65 L.Ed. 1082 (1921). The bill of lading issued by C–M to Andersen contains no notation of visible damage or defect and includes an affirmative acknowledgment that the articles received were "in apparent good order." The bill of lading was also marked "Shipper's Load & Count." The car was loaded by employees of Andersen and sealed. B & M argues that where goods were delivered to a carrier under seal without an opportunity for inspection, a bill of lading reciting that the goods were "in apparent good order" is insufficient to establish delivery to the carrier in good condition.[5] B & M contends

---

5. This argument is apparently supported by the weight of authority. *See, e. g., Ed Miniat, Inc. v. Baltimore & Ohio R.R. Co.*, 587 F.2d 1277, 1279 n.2 (D.C.Cir.1978) ("There had been some

debate concerning the evidentiary effect of a bill of lading which recites that the goods received are 'in apparent good order' when the goods themselves are not open for inspection.

that Brockway has not presented adequate additional evidence of the condition of the shipment when delivered to C–M to satisfy the requirement of *Elmore & Stahl*,[6] *supra*.

 It is true that the probative value of a statement on a bill of lading that the goods are "in apparent good order" is greater when the goods are available for inspection by the carrier than when they are shipped under seal, *Ed Miniat, Inc. v. Baltimore & Ohio Railroad Co.*, 587 F.2d 1277 (D.C.Cir.1978); however, the court is convinced that Brockway has sufficiently established that the shipment was delivered to C–M in good condition. It is uncontroverted that the shipment was damaged by fire. It has been shown that the fire occurred after the shipment was delivered by Andersen and while it was under the care and control of B & M. Photographs introduced at trial depict the charred remains of what appears to be a full carload of doors, windows and frames. Witnesses testified that the car appeared to contain a full load.[7] There is no evidence indicating that the shipment was damaged in any way other than by fire and it would be incredible for the goods to have already been fire–damaged when they were delivered to C–M. We find that this evidence is sufficient to establish the good condition of the merchandise at the time of delivery to the carrier.[8]

 Brockway has sufficiently established that goods delivered to C–M in good condition were damaged while in B & M's possession. Accordingly, a presumption arises that the damage was due to the neg-

. . . We agree with the weight of authority that such a statement in the bill of lading is insufficient to establish delivery in good condition under § 20(11), . . . ."). Yet, it has also been held that a bill of lading *can* establish prima facie that the merchandise being shipped is in good condition even though it was shipped under seal. *See, e. g., United States v. Miss. Valley Barge Line Co.*, 285 F.2d 381 (8th Cir. 1960). A collection of the cases addressing this issue can be found in Annot., *Carrier's Issuance of Bill of Lading or Shipping Receipt, Without Notation thereon of Visible Damage or Defects in Shipment, as creating Presumption or Prima Facie Case of Good Condition When Received*, 33 A.L.R.2d 687 (1954).

6. Most courts hold that a recitation on the bill of lading that the goods were received "in apparent good order" applies only to those portions of the shipment that are visible and open to inspection. *See* note 5 *supra*. Usually additional direct and affirmative proof is necessary to establish that the goods shipped under seal were in good condition when received by the carrier. *See Ed Miniat, Inc. v. Baltimore & Ohio R.R. Co.*, 587 F.2d 1277, 1280 (D.C.Cir. 1978).

7. In addition to its argument that Brockway has failed to establish the good *condition* of the shipment when it was delivered to the carrier, B & M contends that Brockway has not adequately demonstrated that the *quantity* of goods enumerated as being in the car were actually in the car. Brockway and its insurers have not asserted that the car did not contain all of the items listed on the invoice, nor have they refused payment to Andersen of any portion of the amount charged. We find the lists of items on the invoice and the bill of lading,

coupled with the testimony that the car appeared to contain "a full load", sufficient to establish that the quantity of goods enumerated as being in the car were actually in the car.

8. An analysis of the applicable case law might make it appear that the evidence presented in this case is insufficient to establish the good condition of the shipment at the time of delivery to C–M. However, nearly all of the cases finding that the evidence of good condition was insufficient are distinguishable in that they dealt with shipments of perishables, where there was more than a possibility that spoilage occurred before the goods were delivered to the carrier. *See, e. g., Ed Miniat, Inc. v. Baltimore & Ohio R.R. Co.*, 587 F.2d 1277 (D.C.Cir.1978) (spoilage of shipment of meat); *Blue Bird Food Products Co. v. Baltimore & Ohio R.R. Co.*, 492 F.2d 1329 (3d Cir. 1974) (spoilage of shipment of hams); *World-Wide Meats, Inc. v. Chicago & N.W. Transportation Co.*, 383 F.Supp. 807 (N.D.Iowa 1974) (spoilage of shipment of meat). In each of these cases substantial evidence was necessary to prove that spoilage had not occurred prior to delivery of the shipment to the carrier. Brockway's case is different. The evidence is overwhelming that the damage complained of (destruction by fire) occurred while the goods were in the possession of B & M. For this reason, we do not believe that the precedent of this holding will "leave carriers open to unfounded claims by fraudulent shippers abusing the use of the seal", *Ed Miniat, Inc.* 587 F.2d at 1283, nor will it "distort the effect of section 20(11) and make the carrier presumptively liable whenever goods under seal are in imperfect condition when received by the consignee." *Id.*

ligence of B & M and the burden of proof falls upon B & M to show that it was free from negligence and that the damage was caused by an Act of God, acts of a public enemy, public authority, an act of the shipper, or an inherent vice in the nature of the goods. *Condakes v. Southern Pacific Co.,* 303 F.Supp. 1158, 1161 (D.Mass.1968); *Sarno v. Southern Pacific Co.,* 277 F.Supp. 628, 631 (D.Mass.1967); *Process Equipment Co. v. Denver Chicago Trucking Co.,* 275 F.Supp. 698, 700 (D.Mass.1967). B & M has failed to show by a preponderance of the credible evidence that it was free from negligence and that the damage to the cargo was due to one of the excepted causes.[9] Therefore, we conclude that the damage sustained by the carload of merchandise while in transit was a proximate result of negligence on the part of B & M.[10]

▮ As damages, Brockway is entitled to its "full actual loss." 49 U.S.C. § 20(11). Brockway paid Andersen the sum of $25,436.56 for the shipment, which was totally destroyed except for salvage of $1823.39. Brockway claims that, under the general rule, it is entitled to the difference between the market value of the property in the condition in which it should have arrived at its market value in the damaged condition in which it did arrive. *See Chicago Milwaukee & St. Paul Railway Co. v. McCaull–Dinsmore Co.,* 253 U.S. 97, 40 S.Ct. 504, 64 L.Ed. 801 (1920). According to Brockway, the market value of the shipment, i. e. the average selling price to its customers at the time it was to arrive, amounts to $38,638.33, resulting in an actual loss after salvage of $36,814.94.

The general rule of market value less salvage, however, is not always the best measure of actual loss. That measure of damages "may be discarded and other more accurate means resorted to if, for special reasons, it is not exact or otherwise not applicable." *Illinois Central Railroad Co. v. Crail,* 281 U.S. 57, 64–65, 50 S.Ct. 180, 181, 74 L.Ed. 699 (1930).[11] Where the general rule would work out to give the consignee more than indemnity, the courts have refused to adopt it. *Weirton Steel Co. v. Isbrandtsen–Moller Co.,* 126 F.2d 593, 594 (2d Cir. 1942).

9. Andover Deputy Fire Chief Harold Hayes investigated the scene of the fire and determined that the fire was started with a flammable liquid. He concluded that the cause of the fire was "Arson by person or persons unknown". We are persuaded by the evidence to find that the fire is attributable to arson. This, however, does not relieve B & M from liability because, even though arson may be the act of a public enemy (an excepted cause), B & M has failed to establish its freedom from negligence. *See Process Equipment Co. v. Denver Chicago Trucking Co.,* 275 F.Supp. 698, 700 (D.Mass. 1967) ("the burden of proof is upon the carrier to show *both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes....*" quoting *Mo. Pac. R. R. Co. v. Elmore & Stahl,* 377 U.S. 134, 138, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964) (emphasis added)). B & M was negligent in leaving the car in an unguarded spot without notice to Brockway; such negligence substantially contributed to cause the damage.

10. B & M contends that its liability is abrogated by section 1(b) of the bill of lading, which provides in pertinent part that "the carrier or party in possession shall not be liable for loss, damage or delay . . . resulting from . . . riots or strikes." B & M argues that the fire was the result of the strike at Brockway's plant and that, therefore, B & M is not liable for the

loss. Although arson may have been involved, nothing, aside from conjecture, establishes that the fire was set by strikers. Accordingly, section 1(b) is inapplicable.

B & M also contends that it is relieved from liability by an indemnity clause in the sidetrack agreement between Brockway and B & M. The provision grants indemnity to B & M "for loss, damage or injury from any act or omission of the shipper [Brockway], its employees or agents, to the person or property of the parties hereto and to the person or property of any other person or corporation while on or about the sidetrack." B & M argues that Brockway's failure to tell B & M that its employees were on strike and that B & M should keep its cars at Lowell Junction falls within the scope of that provision. There is no merit to this contention. The testimony clearly establishes that B & M was aware of the strike. In addition, B & M was not given permission to leave cars on Brockway's sidetrack overnight. B & M has shown no "act or omission."

11. In *Crail* the consignee, a retail dealer, claimed the retail value of a parcel of coal lost in route. The Court allowed only the wholesale price because he had been able to replace his reserve at wholesale prices without losing any retail sales.

Brockway has shown no loss of sales opportunities or profits. It was able to replace the shipment out of its own warehouse stock. The rationale behind the general rule, that replacement costs would deprive a shipper of expected profit and would not compensate him for what he would have received had carriage been properly performed, see *Polaroid Corp. v. Schuster's Express, Inc.*, 484 F.2d 349, 351 (1st Cir. 1973), does not exist in this case. Therefore, Brockway is entitled only to the cost of replacing the shipment,[12] plus interest and court costs.

Brockway carries two policies of insurance covering the loss.[13] One of the policies, Lumberman's Mutual (Kemper Insurance Company), insures the real and personal property of Brockway against loss by fire or other perils. It includes coverage of Brockway's personal property "while such property is . . . in or on vehicles which are in the open on land within 500 feet of [Brockway's] premises" and Brockway's "interest in . . . railroad rolling stock and contents thereof while on [Brockway's] premises or in the open on land within 500 feet thereof . . . ." Brockway's building supplies were destroyed while they were on Brockway's premises; thus, Kemper's policy covers the loss.

The second policy, provided by the American Insurance Company (Fireman's Fund American Insurance Company), is labeled "Transportation Floater Policy" and insures shipments of building supplies against "all risks of direct physical loss . . . or damage." It attaches "from the time the insured property leaves the factory, store, warehouse, or elsewhere at the initial point of shipment, and covers continuously thereafter in the ordinary course of transit, until delivered at factory, store, warehouse or elsewhere at

destination." When the shipment was destroyed, it had not yet been delivered by B & M; it was still in the ordinary course of transit. Accordingly, the Fireman's Fund policy also covers the loss.

■ Brockway and the two insurance companies maintain that this problem of overlapping or double coverage can be solved by looking to the "Guiding Principles", an agreement drafted by the insurance industry to resolve problems of overlapping coverage. This agreement, to which both insurance companies have bound themselves, provides, in part, that insurance covering a specific type of loss shall take precedence over insurance not limited to that specific type of loss. Both companies agree that under the "Guiding Principles" Fireman's Fund would be solely liable for Brockway's loss because it was specifically written to cover "in transit" losses.

In most situations involving overlapping coverage, we would have no objection to an agreement between the two insurance companies providing for their respective liabilities, so long as the insured was fully indemnified for his loss. This case, however, presents unusual circumstances which render it necessary that we disregard the "Guiding Principles" and make a legal determination, based upon established principles of insurance law, as to the respective liabilities of the two insurance companies.[14]

Section 2(c) of the interstate bill of lading provides that "[a]ny carrier or party liable on account of loss or of damage to any of said property shall have the full benefit of any insurance that may have been effected upon or on account of said property, so far as this shall not avoid the policies or contracts of insurance: Provided, That the carrier reimburse the claimant for the premi-

---

12. The cost of replacing the shipment in this case would equal the net invoice price adjusted for the difference in the cost of the goods on August 6, 1974, the date the shipment was destroyed, and on June 19, 1974, the date the original shipment was purchased, minus salvage value. There is no evidence regarding the difference in price Andersen would have charged for an identical replacement shipment on August 6th. Assuming it was the same

price on both dates, replacement cost equals net invoice cost ($25,436.56), minus salvage ($1823.39), or $23,613.17. Therefore, we find the replacement cost equal to $23,613.17.

13. Either policy, by itself, provides sufficient coverage to fully replace the loss.

14. *See* note 15 *supra*.

um paid thereon." B & M claims that this provision entitles B & M to receive the benefit of any proceeds paid by Kemper.[15] B & M does not make the same claim against Fireman's Fund because its policy contains a "no benefit to bailee" clause[16] which negates the effect of section 2(c). If section 2(c) is valid,[17] then B & M is entitled to the benefit of any proceeds to be paid by Kemper;[18] however, if Fireman's Fund is liable for fully covering the loss, as contended by Brockway and the insurance companies, then section 2(c) never comes into play. Therefore, it is the duty of this court to determine whether, as a matter of law, Kemper is liable for covering all or a part of the loss.

Each of the policies contains what is known as an "excess insurance" clause which states, in effect, that its coverage is intended only to supplement or provide excess insurance over any other insurance which would apply in its absence.[19] Obviously, both of these "excess insurance" clauses cannot be recognized because, if taken literally, neither policy would afford coverage. Resolving the question of priority of coverage would also settle the question of which of the two "excess insurance" clauses should be given effect. *Hartford Steam Boiler Inspection & Insurance Co. v. Cochran Oil Mill & Ginnery Co.*, 26 Ga.App. 288, 105 S.E. 856 (1921), a case often cited by courts dealing with these issues, provides some insight:

> The proper construction of policies of insurance, as regards proportionate contribution between two or more insurers, has given rise to many and diverse rules, and has sometimes been considered one of the most difficult and troublesome questions in the law of insurance. The proposition is simple enough, where there are several valid policies in different companies, which insure the same party, upon the same subject matter, and assume the same risk. This constitutes what is denominated "double insurance," and ... each policy must in such a case contribute proportionately to the loss, .... Where, however, the insurance is not strictly and

15. Because section 2(c) of the bill of lading grants B & M an interest, as third–party beneficiary, in the Kemper policy, we cannot recognize the "Guiding Principles." An independent agreement between Kemper and Fireman's Fund purporting to exempt Kemper from any liability for covering the loss may be valid as between the two insurance companies, but B & M cannot be held to that agreement of which it was not a party and which appropriates a vested property interest from B & M.

16. That clause states: "This insurance shall in nowise inure directly or indirectly to the benefit of any carrier or other bailee." Such a clause negates the effect of a provision like section 2(c) of the bill of lading. *National Garment Co. v. New York, C. & St. L. R. Co.*, 173 F.2d 32, 35 ·36 (8th Cir. 1949). Kemper's policy lacks a "no benefit to bailee" clause. For that reason, B & M contends that under section 2(c) it is entitled to the benefit of any proceeds paid by Kemper.

17. Brockway and the insurance companies assert that we should find Fireman's Fund primarily liable for covering the total loss because its policy specifically covers the loss of goods in transit. In the alternative they argue that we should declare section 2(c) invalid as discriminatory and against public policy. *See China Fire Ins. Co. v. Davis*, 50 F.2d 389 (2d Cir. 1931). We need not address the public policy argument unless we find that Kemper is liable for covering all or part of the loss.

18. In such a case section 2(c) requires that B & M tender to Brockway an amount sufficient to reimburse Brockway for the premium paid to Kemper. In this case, were B & M to receive the benefits of Kemper's policy, it would be required to reimburse Brockway the amount of $4,405.00, the premium applicable to Brockway's plant at Andover.

19. The Fireman's Fund policy states: "If at the time of loss or damage there is available to a named or unnamed Insured or any other interested party any other insurance which would apply in the absence of this policy, the insurance under this policy shall apply only as excess insurance over such other insurance." Kemper's policy contains an apportionment clause providing that its liability "shall not exceed that proportion of any loss to the property covered which the amount of insurance under this Policy bears to the whole amount of ... insurance insuring against such loss" but also contains the following: "If any insurance, insuring against loss to the property covered, does not contain apportionment provisions similar to the apportionment provisions contained herein this insurance shall apply as excess over such other insurance." Fireman's Fund's policy does not contain apportionment provisions of any kind; therefore, Kemper's "excess insurance" clause applies. The result is that each policy purports to provide coverage only in excess of what the other policy provides.

technically "double" insurance—that is, where the policies are not limited to the same subject—matter, and the risk assumed is not identical or coextensive but one policy is a "general," "compound," or "blanket" policy, and the other is "specific," and the rules of priority are not specifically provided for by the policies themselves—there arises a great diversity and lack of harmony in the various rules laid down by the appellate courts of many jurisdictions.

*Id.*, 105 S.E. at 857. The appellate courts of Massachusetts, the forum state, have not had occasion to address these precise issues; however, as in *Hartford*, the insurance in this case is not technically "double" insurance.

■ Double insurance takes place when an insured makes two or more policies on the same subject, the same interest, and against the same risks. 6 *Appleman Ins. L. & P.*, § 3903, pp. 425–32 (1972). Fireman's Fund's policy covers loss or damage occurring while "in the ordinary course of transit." Kemper's policy covers losses occurring while the property is on or within 500 feet of Brockway's premises. Although the policies overlap, they are not of the same nature and character, and the risks insured against are not identical; hence, there is no double insurance. For that reason, we must determine which policy is general and which is specific.[20]

In *Hartford*, one policy protected an employer against loss growing out of various sorts of injuries to his employees. A second policy covered property damage and personal injury resulting from a certain hazard. When that hazard occurred, an employee was injured. In the resulting suit, the first insurance company was held to be primarily liable inasmuch as its policy specifically covered injuries to employees. The second policy, being more general, was held to provide excess insurance, attaching only after exhaustion of the more specific policy.

In *Blinbaum v. Union Marine & General Insurance Co.*, 5 Misc.2d 640, 149 N.Y.S.2d 481 (1955), *aff'd.*, 5 Misc.2d 645, 158 N.Y. S.2d 969 (1956), the court was asked to determine which of two personal property casualty policies, both covering the same property and each providing that its insurance was excess, primarily covered a loss. The loss occurred while the insured property was in the possession of a carrier. The court held that the policy insuring against hazards of travel was the more specific insurance, and therefore primarily liable. It "clearly insured the plaintiff . . . against a specific peril." *Id.*, 149 N.Y.S.2d at 483.

■ The authorities generally agree that a general or blanket policy is intended only to supplement specific insurance; it does not become effective until the specific insurance is exhausted. 6 *Appleman Ins. L. & P.*, § 3912, pp. 483–84 (1972). *Hartford Steam Boiler Inspection & Insurance Co. v. Cochran Oil Mill & Ginnery Co., supra,* and *Blinbaum v. Union Marine & General Insurance Co., supra,* when examined in light of the special circumstances of this case, persuade us to classify the Fireman's Fund policy as specific[21] and the Kemper policy

**20.** *Hartford Steam Boiler Inspection & Insurance Co. v. Cochran Oil Mill & Ginnery Co.*, 105 S.E. at 858, provides that:

where the several policies are of a different nature and character, and where the risk assumed is only partly coextensive, and where each policy expressly provides that the risk assumed, at the point of mutual contact, is "excess" insurance only, and therefore secondary to the other policy . . . the decisive test to be applied in determining which of these two limitations is to be given effect (that is, which is really primary or basic insurance, and which is excess insurance only) lies in the answer to the question

as to which insurance is general and which is specific in its nature.

**21.** The Fireman's Fund policy specifically insures against losses occurring while the goods are in transit. Brockway's loss occurred during the course of transit; therefore, Fireman's Fund provides primary coverage. Moreover, Kemper's policy should not be considered primary because Brockway had no knowledge that the goods were on its premises, nor had Kemper's policy ever attached to the goods prior to their being placed on Brockway's premises.

as general. Therefore, Fireman's Fund is the primary insurer of Brockway's shipment. And since the Fireman's Fund policy extends full coverage, Kemper, as the excess insurer, does not contribute. Accordingly, Section 2(c) of the bill of lading is inapplicable.

Counsel for the three plaintiffs will prepare a judgment order in accordance with this opinion and, after endorsement by counsel for Boston and Maine Corporation (which endorsement shall not be construed as an agreement to the findings and conclusions herein, but only as to the form and computation of judgment), to be forwarded to the undersigned for entry.